[Civil No. 2760. Filed June 25, 1928.]

[268 Pac. 773.]

CITRUS GROWERS' DEVELOPMENT ASSO-CIATION, INC., a Corporation, and THOMAS J. PRESCOTT, Appellants, v. SALT RIVER VALLEY WATER USERS' ASSOCIATION, a Corporation, F. A. REID, F. C. HENSHAW, H. C. GILBERT, E. RAY COWDEN, OBED M. LASSEN, F. O. WEEKS, H. M. WELBORN, JAMES MINOTTO, D. V. FOUNTAIN, RAY SAYLOR and W. T. TWEEDY, Appellees.

Messrs. Baker & Whitney, for Appellants.

Messrs. Kibbey, Bennett, Gust, Smith & Lyman, for Appellees.

Mr. John W. Ray, *Amicus Curiae.*

LOCKWOOD, J.—This action was originally brought by Citrus Growers' Development Association, a corporation, hereinafter called plaintiff, to enjoin the Salt River Valley Water Users' Association, hereinafter called the association, from selling and disposing of a certain proposed bond issue of $5,100,000, and from executing a trust deed and levying assessments upon the lands owned by shareholders of the association to secure the payment of said bonds. Thos. J. Prescott was granted leave to intervene and file a complaint in intervention. Both the amended complaint of plaintiff and the complaint in intervention were demurred to, and the trial court having sustained both demurrers, and plaintiff and intervener having elected to stand on their pleadings, judgment was rendered dismissing the complaints, from which judgment plaintiff and intervener have taken this appeal.

The association is a corporation organized under the laws of the territory of Arizona, February 9, 1903, for the purpose of providing an adequate supply of irrigation water for certain lands lying in what is commonly known as the Salt River Project. The situation existing at the time of incorporation was highly complicated, and as a result the articles of incorporation, which were worked out jointly by the owners of the land to be benefited and the offi-

cials of the United States Reclamation Service whose duty it was to administer the Reclamation Law which provided the funds for the original reservoirs and canals necessary to be constructed, are voluminous and were probably at that time at least unique in character. It was organized under the law relating to private corporations; its charter contains all the provisions required by law for such corporations, its bonds have been treated as those of a private corporation so far as the federal income tax is concerned, and this court has impliedly, at least, recognized that its charter could not be amended without its own consent.

On the other hand, its affairs are conducted in many respects as are those of a municipal corporation, its purposes are those generally found only in organizations such as irrigation districts and other similar institutions, which are considered as municipal corporations for most purposes, and it has been given the right to exercise many powers similar to those usually conferred only on branches of the government. It can probably be best described as a private corporation with a public purpose, and having *quasi* governmental powers.

Membership in the association was limited to the owners of irrigable land lying within the project, each acre of land entitling the owner to one share of stock in the corporation. Its management was vested in a bicameral body chosen by a system more resembling the election of a legislature than the ordinary one used in selecting the officers of private corporations, one division being called a council, and consisting of thirty members, empowered generally to enact by-laws and make rules and regulations for the government of the corporation; the other division, a board of governors of eleven members, including the president of the association, whose duty it was to administer its affairs, subject to the articles of in-

corporation and by-laws. No provision existed in the charter for the ordinary shareholders' meeting generally found in private corporations, any action by them being taken at an election conducted much like the ordinary political one. Revenue for corporate purposes was raised by levying assessments on the shareholders, which assessments, like taxes, became a lien upon their lands until payment, and following the requirements of the then existing statute, the indebtedness of the association was limited to an amount not exceeding two-thirds of the capital stock, which was fixed at $3,750,000. Amendments to the charter were covered, so far as the association was concerned, by article 18 thereof, which reads as follows:

"These articles of incorporation can only be amended by the shareholders at a regular annual election or at a special election called for that purpose. No proposed amendment shall be submitted to the shareholders until it shall have first received the approval of two-thirds of the members of the council at a regular or duly called session thereof, nor shall any such proposed amendment be so submitted until it shall have been published in full at least once in each week for four consecutive weeks in at least three newspapers published and of general circulation within the territory described in article IV, of these articles, the last of which such publications shall be not less than 10 nor more than 20 days before any such election."

At the time of organization of the association, the only statutory provision expressly authorizing amendments of the charter was paragraph 770, Revised Statutes of Arizona of 1901, which read, so far as material for our consideration, as follows:

"The capital stock of any corporation organized hereunder may be increased or decreased and the articles may be amended in any of the particulars mentioned in section 6 of this title by the affirmative vote of a majority of the stockholders. . . . "

Section 6, therein referred to, did not contain any provisions regarding limitation of corporate debts. Section 7 of paragraph 767, Revised Statutes of Arizona of 1901, however, read in part as follows:

" . . . Such articles of incorporation must specify the highest amount of indebtedness and liability, direct or contingent, to which the corporation is at any time to be subject, which must in no case exceed two-thirds of the amount of the capital stock."

And this continued substantially to be the law until 1923, when the statute was amended so as to allow corporations to increase their indebtedness in certain cases beyond the two-thirds limitation above referred to, and the association has since from time to time amended its charter in conformity with that statute so as to permit it to increase its total indebtedness greatly beyond the amount of two-thirds of its capital stock.

In the spring of 1928, the association was indebted to the extent of approximately $14,000,000. Of this nearly half was the amount remaining unpaid to the United States for the original construction charges of the project; $1,800,000 was for bonds issued for the construction of what is known as the "Mormon Flats Development"; $4,400,000 was for bonds for the "Horse Mesa Development"; $1,000,000 was for bonds issued to cover operation and maintenance expenses; and about $650,000 was general liabilities. The charter had been amended from time to time so as, on its face, to authorize all the above indebtedness. Thereafter and during the month of March, 1928, there were submitted to the shareholders of the association, at a special election, a number of propositions which, if approved by the shareholders and the State Corporation Commission, would on their face authorize the association to issue $4,100,000 of the bonds and to levy part of the assessments com-

plained of in this proceeding, for the purpose of constructing what was designated as the "Stewart Mountain Development." Some of the propositions failed to receive the statutory majority, and thereafter on the eighth day of May of the same year these same propositions were again submitted to the shareholders at another special election, at which time they received the majority required by law and the charter, and the board of governors were proceeding to sell the bonds in the amount authorized by the vote of the shareholders aforesaid, together with other bonds in the sum of $1,000,000 (to which last bonds we shall refer hereafter), when this proceeding was commenced to stop the sale.

There is no dispute as to the facts of the case, and the questions presented to us are solely legal in their nature. We will take them up in their order. The first is that at the date of organization of the association there was no act of Congress nor any law of the territory reserving to the state the right to amend charters of corporations adopted under the law then in force; that the statute authorizing voluntary amendment of its charter by the corporation was not broad enough to cover amendments in regard to the amount of corporate debts allowed, and therefore the charter created a contract between the state, the corporation, and its shareholders, limiting the amount of such debts, which limitation under article 1, section 10, of the federal Constitution, was not subject to amendment by any subsequent legislation, nor could the corporation itself make such a change, except by consent of all of its shareholders.

That the articles of incorporation were a contract, and that they cannot be amended by action on behalf of the state in the absence of a reserved power, is unquestioned. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 4 L. Ed. 629; *Hammons* v. *Watkins*,

33 Ariz. 76, 262 Pac. 616; *Herndon* v. *Hammons,* 33 Ariz. 88, 262 Pac. 620. Nor did such reserved power exist at the time the articles were adopted. *Hammons* v. *Watkins, supra; Herndon* v. *Hammons, supra.*

In 1913 when the first state Constitution was adopted, article 14, section 2, thereof read in part as follows:

" . . . Laws relating to corporations may be altered, amended, or repealed at any time, and all corporations doing business in this state may, as to such business, be regulated, limited, and restrained by law."

In 1923 the legislature enacted chapter 4 of the Session Laws of that year, certain portions of which we quote:

"The articles of incorporation must contain: . . . The highest amount of indebtedness or liability, direct or contingent, to which the corporation is at any time to subject itself, which must in no case exceed two-thirds of the amount of the capital stock. . . . Provided, that indebtedness heretofore or hereafter authorized by not less than three-fourths of the votes cast in accordance with the provisions of the articles of incorporation and by-laws at any regular or special meeting or election of the stockholders of any corporation and approved by the Corporation Commission of the State of Arizona, shall not be subject to the limitations herein prescribed, and shall not be considered a part of the indebtedness so limited."

These provisions, of course, were not applicable to private corporations organized before 1913, except as they voluntarily and legally accepted them. *Hammons* v. *Watkins, supra; Herndon* v. *Hammons, supra.* The association, however, attempted to act under chapter 4, *supra,* and by a majority of more than three-fourths of the votes cast on the proposition, but by much less than three-fourths of the total

number of shares outstanding, did authorize the increase of indebtedness involved in this action. A considerable number, though, of the shareholders of the association voted against such increase and have expressed their protest in every possible manner. The question then is: What is necessary for the legal acceptance by a corporation of the authority to increase the amount of its indebtedness granted in the Act of 1923?

The general rule of common law is that an amendatory act, like an original charter, must be accepted by the corporation and its members. If such an amendment radically or fundamentally changes the character of the corporation, it follows that no majority of the stockholders have the power to bind a dissenting minority, and *a fortiori* the unanimous consent of the stockholders is necessary to the acceptance of any proposed fundamental amendment. *Perkins* v. *Coffin,* 84 Conn. 275, Ann. Cas. 1912C 1188, 79 Atl. 1070; *Atlanta Steel Co.* v. *Mynahan,* 138 Ga. 668, 75 S. E. 980; *Colgate* v. *United States Leather Co.,* 75 N. J. Eq. 229, 19 Ann. Cas. 1262, 72 Atl. 126; *Baldwin* v. *Hillsborough & C. Ry. Co.,* 10 West Law J. 337. Neither can the fact that the alteration is beneficial give the majority the power to accept it against the dissent of the minority. A stockholder has a right to stand on the terms of his contract of membership and to insist that the corporation shall not be diverted from the purpose authorized when he became a member. *Stevens* v. *Rutland B. R. Co.,* 29 Vt. 545. In the present case, however, the original articles of incorporation, in article 19 thereof, read as follows:

"This association may accept and avail itself of, or subject itself to, the provisions of any law or laws enacted, or that may be enacted by Congress, or the legislative assembly of the territory, or state, when it becomes a state, of Arizona, relative to cor-

porations, which may be applicable to corporations organized for like purposes as this association. Such acceptance or subjection shall be valid when ratified by at least two-thirds of the votes cast at any annual election, or at any special election called for the ratification thereof."

It appears from this that the original charter expressly authorized the acceptance by the corporation of any subsequent act of the legislature, and specifically provided that it might be done by a vote of two-thirds of the shareholders voting at any election. This article is part of the original contract between the corporation and its shareholders, and therefore no individual shareholder may be heard to complain if the provisions of any statute adopted by any legislature subsequent to the original incorporation are made a part of the charter of the association in the manner set forth in said article 19. We hold, therefore, that an amendment to the articles of incorporation authorizing the increased indebtedness involved herein, if adopted in the manner set forth in article 19 and in chapter 4, *supra*, does not violate any rights of a shareholder which are protected by article 1, section 10, of the federal Constitution. While it does not appear in the record that the association has ever submitted at any election the specific question whether or not chapter 4, *supra*, should be accepted, yet it has repeatedly amended its charter in the manner set forth in said chapter, and by a majority much larger than that provided in article 19, *supra*. We think such action equivalent to "an . . . election called for the ratification thereof."

The next objection made is that one of the propositions submitted to the shareholders at the election of May 8th was an amendment to the Constitution purporting to authorize distribution of the hydroelectric power generated by the association to its

shareholders under certain conditions, and that the proposition did not set forth the article as it would read after the amendment was made, but merely the new language to be inserted in the section. There is an express provision in the Constitution of the state prohibiting this method of amending acts of the legislature, and it is urged that the association is a municipal corporation, and that the same principle should therefore apply to an amendment of this article. We have been cited to no decision requiring that in the absence of some specific provision of the Constitution, of statute, or of the charter, an amendment to either a legislative act, municipal ordinance, or private charter must be made or submitted in the manner contended for by plaintiff. As we have stated, the association is not a municipal corporation, and there is no such provision applying to organizations like it. Such being the case, the form of submission was within the reasonable discretion of the governing body of the association, and we cannot say the amendment as submitted did not fairly inform the shareholders of the proposition upon which they were voting.

The next objection is that the whole election was void for the reason the notice thereof was not sufficiently specific to advise the shareholders of what questions were to be voted on. It is not within the province of the courts to declare any form of notice of a shareholders' meeting insufficient, if it complies with the charter and by-laws of the corporation, unless there is some specific statutory provision to the contrary. *Taylor* v. *Griswold,* 14 N. J. L. 222, 27 Am. Dec. 33; *Cogswell* v. *Bullock,* 13 Allen, (Mass.) 90; *Riggs* v. *Polk Co.,* 51 Or. 509, 95 Pac. 5; *Whipple* v. *Christie,* 122 Minn. 73, Ann. Cas. 1914D 856, 141 N. W. 1107.

The by-laws provide that whenever any work is to be undertaken, or any indebtedness incurred in

excess of $50,000, except for ordinary operation, maintenance or repairs, the matter may be submitted to the stockholders at a special election. No particular form of notice of such election seems to be provided except where the undertaking is of the nature contemplated by section 2, article 4, of the charter. In such case, the board of governors must give the undertaking a specific name in a resolution approving it, and submit the resolution to the council, which, as it approves, adopts a resolution so stating, and sends all papers to the secretary. He then gives notice to the shareholders in a specified form. Such notice, among other things, contains a statement that a copy of the proposition may be seen at the office of the secretary. Section 2, article 4, *supra,* applies only to certain types of contracts with the federal government. The notice given was in strict conformity with these provisions of the by-laws. So far as propositions not covered by section 2, article 4, *supra,* are concerned, there being no specific by-laws covering them, they would be governed by the general rule, which is that notices of special meetings of stockholders of private corporations need be in no particular form unless the charter or by-laws require one. They must, however, state fairly the business to be transacted. *Dolbear* v. *Wilkinson,* 172 Cal. 366, Ann. Cas. 1917E 1001, 156 Pac. 488; *Evans* v. *Boston Heating Co.,* 157 Mass. 37, 31 N. E. 698; *Synnott* v. *Cumberland Bldg. Loan Assn.* (C. C. A.), 117 Fed. 379.

Elections held by the association are, of course, in effect, although not technically, stockholders' meetings. *Orme* v. *Salt River Valley W. U. Assn.,* 25 Ariz. 324, 217 Pac. 935.

In this case the notice states clearly the general nature of each proposition to be voted and that a copy of the proposition could be seen at the office of the secretary. We think this was sufficient notice

that each question submitted covered all matters appearing in the proposition so on file, as well as all things appearing in any of the official minutes and records of the association which were referred to in such proposition.

It is further contended that under paragraph 2102, Revised Statutes of Arizona of 1913, at least thirty days' notice in writing must be given the shareholders of any corporation of any proposed amendment to the articles of incorporation, and that the notice contemplated by such paragraph is a personal written notice delivered or mailed to each shareholder, and not a notice by publication in a paper. At the time of the original incorporation such provision did not appear in the statutes, and article 18 of the charter expressly set forth the method of giving notice of proposed amendments. The association therefore was not bound by the provisions of paragraph 2102, *supra,* unless it accepted them, and notice given in the manner provided by charter was sufficient. This was done. Further publication has been the method of giving notice of the elections for more than twenty years, with the general acquiescence of the shareholders, and they may not now complain. *Orme* v. *Salt River Valley W. U. Assn., supra.*

The next objection is that there is no provision in the by-laws providing for a special election to amend the articles of incorporation, nor, if there be such, is there any provision in case a proposition fails at one special election that it can be resubmitted at another. We think both these matters are answered by article 18 of the charter. Therein it is provided:

"These articles of incorporation can only be amended by the shareholders at a regular annual election or at a special election called for that purpose."

The article obviously authorized special elections to pass upon proposed amendments to the charter, and does not limit the number which may be called for that purpose. Unless the by-laws expressly limit the governing body in that respect, we think it may use its discretion as to the number of special elections. *Cassell* v. *Lexington, etc.,* 10 Ky. Law Rep. 486, 9 S. W. 502, 701; *Commonwealth* v. *Smith,* 45 Pa. 59.

The next objection is that the bonds as voted extend over a period of approximately thirty years and that the corporate life of the association will expire by limitation some ten years before the bonds are due. The assessments levied to secure their payment and the lien created thereby on the land of the shareholders will also outlive the corporation. It is the ordinary rule of law that a corporation is not limited in making contracts to those which must be completed before the expiration of the corporate life. *Lancaster* v. *Aud. Assn.,* 87 Neb. 87, 127 N. W. 226; *Union Pac. R. Co.* v. *Chicago etc. R. Co.,* 136 U. S. 574, 41 L. Ed. 265, 16 Sup. Ct. Rep. 1173; *Detroit Citizens' Ry. Co.* v. *Detroit,* (C. C. A.) 64 Fed. 628, 26 L. R. A. 667; *Hill* v. *Atlantic & N. C. R. Co.,* 143 N. C. 539, 9 L. R. A. (N. S.) 606, 55 S. E. 854. Particularly is this true with a corporation of the nature of the association. While, in compliance with the statute, its charter limited its duration to the term of twenty-five years, the charter could be renewed from time to time. Further, the ordinary business corporation might well contemplate that the purpose of its existence would be terminated in twenty-five years, but where continued operation of a corporate entity in some form and under some name is absolutely essential to the well-being, prosperity, and even life of a large proportion of the inhabitants of the state, it may well be held that while theoretically it may be conceived to have an

end in the particular form in which it started, yet practically its failure to continue its existence is as inconceivable as that the state itself should cease to function. Even were it true that by some chance or inadvertence the association would dissolve, there can be no doubt that, if no other method of continued operation appeared, a court of equity would exercise that power through a receiver or otherwise. We are of the opinion the fact that the bonds extend beyond the present legally authorized period of existence of the association in no way affects their validity.

This concludes a discussion of all the objections raised to the issuance and sale of the $4,100,000 worth of bonds approved by the shareholders of the association at the special election of May 8th. Finding as we do that they were authorized in all respects as provided by law and the charter of the association, their validity is established.

The remaining question is as to the legality of the $1,000,000 bond issue authorized by the board of governors and council of the association, May 16, 1928, and advertised for sale at the same time as were the $4,100,000 bonds authorized by the shareholders and above discussed. The circumstances connected with the issue of these bonds, and necessary for a determination of their validity, are as follows: In 1924 the association incurred an indebtedness, direct and contingent, of $4,400,000 for the purpose of constructing the improvement known as "Horse Mesa Development." In connection therewith, it levied certain assessments and pledged certain power revenues, executing a trust deed commonly known as the "Horse Mesa Trust Indenture." In said indenture, it provided as follows:

"The association further covenants that it will not levy any assessment or assessments on a parity with or other than junior and subordinate to said special assessments numbers 1, 2, 3 and 4, and said

other assessments herein agreed to be levied by it to further secure the payment of said two million five hundred thousand dollars ($2,500,000.00) in bonds and/or said six hundred and sixty-five thousand dollars ($665,000.00) in bonds of said district No. one, and/or said one million five hundred and seventy-eight thousand dollars ($1,578,000.00) in bonds of said district No. two, and any assessments which may be levied to provide funds for the government construction costs, to secure the payment of any indebtedness whatsoever incurred for providing funds for new and additional power development, unless (a) its net power revenues as hereinafter defined for the twelve months next preceding the incurring of such indebtedness shall have been at least one hundred and fifty per cent. (150%) of the greatest amount of principal and interest which the association thereafter will be required to pay in any subsequent calendar year on its indebtedness then outstanding, and unless (b) its net power revenues as hereinafter defined for the twelve months next preceding the incurring of such indebtedness shall have been at least one hundred and twenty-five per cent. (125%) of the greatest amount of principal and interest which the association thereafter will be required to pay in any subsequent calendar year on its indebtedness to be incurred. Net power revenues for a twelve months' period are hereby defined as follows:

" 'The gross receipts by the association from the sale during such twelve months' period of electric energy over and above all costs of operation and maintenance of the association during such twelve months' period in generating, transmitting and distributing electric energy for sale to its customers, determined in accordance with accepted principles of accounting.' "

In January, 1927, the association, by action of its board of governors and council, issued bonds in the sum of $1,000,000 to refund outstanding obligations of the association incurred for ordinary expenses of operation and maintenance, and levied upon the lands of the shareholders special assessments Nos. 5

and 6 to secure the payment of the bonds. These bonds were made payable in three equal installments during the years 1929, 1930, and 1931. They are not callable before their due date; but the association is authorized to purchase them in open market from the proceeds of the special assessments Nos. 5 and 6, as there may be sufficient funds for that purpose.

The board of governors, in addition to the $4,100,000 worth of bonds authorized by the shareholders May 8, 1928, decided to issue an additional $1,000,000 worth of bonds running up to thirty years for the purpose of refunding those due as above in 1929, 1930 and 1931, and proposed as security for the entire $5,100,000 bonds to levy certain assessments on the lands of the shareholders on a parity with the assessments levied for the purpose of paying the Horse Mesa Development bonds.

Three objections are raised in regard to this last bond issue for $1,000,000. The first is that it was not authorized by a vote of the shareholders. The second is that it increases the total outstanding indebtedness beyond the amount authorized by the charter, and the third is that it violates the terms of the Horse Mesa Trust Indenture by increasing the indebtedness of the association beyond the amount authorized in such indenture, and placing the new indebtedness on a parity with the Horse Mesa bonds. We will discuss these questions in their order.

Under the charter it is provided by section 8, article 8:

"The board of governors shall have the administration of the corporate affairs and business of the association and shall manage and conduct the same subject to all the provisions of these articles and of the by-laws."

It is the ordinary rule of law that, unless otherwise provided by the charter or by statute, the

consent of stockholders is not necessary to an issuance of bonds; the board of directors being vested with that authority. *Hodder* v. *Kentucky & Gr. East. Ry. Co.*, (C. C.) 7 Fed. 793. The only limitation on this authority in the charter of the association is found in section 8 of article 8, which reads in part as follows:

"Except for the ordinary operation, maintenance and repair, no work shall be undertaken, purchase made or indebtedness incurred or be authorized during any one year whereof the cost or amount thereof shall exceed one hundred thousand dollars ($100,-000.00), until it shall have first been ratified by at least a majority of the votes cast at an annual election or at an election to be called for that purpose. . . . "

The bonds in question are to be issued to refund other bonds which were issued to refund outstanding obligations incurred for ordinary expenses of operation and maintenance. Under the charter the consent of the stockholders was not necessary for the original indebtedness incurred for those purposes. *Brewster* v. *Salt River Valley W. U. A.*, 27 Ariz. 23; 229 Pac. 929. The original indebtedness having been within the authority of the board of governors, we think that the first bonds refunding the same were merely a change in the form of the indebtedness and equally within the authority of the board, and *a fortiori* it is true with the present proposed issue.

The second objection is that the proposed bonds would increase the indebtedness of the association beyond the charter limit. Under the charter the indebtedness of the association, not including certain specified exceptions, is limited to $2,500,000. There was outstanding on May 16, 1928, the date when the board of governors approved the last refunding bonds, an indebtedness, exclusive of the items which under the charter were not to be considered in determining whether the debt limit was exceeded,

the million dollar bond issue of January, 1927, and $668,000 floating indebtedness. It is contended that the refunding bonds proposed to be issued by the board of governors will increase the indebtedness so that it will be approximately $170,000 over the charter limit, since there will be outstanding after such issue two bond issues for $1,000,000 each, and a floating indebtedness of $668,000 as above. It appears, however, that as a condition of the last bond issue it is provided that the proceeds thereof shall be immediately placed in the hands of the trustee of the issue of January, 1927, and used by it solely for the purpose of paying those bonds, principal and interest, as they shall become due. In other words, the money raised by the last bond issue is to be placed in a sinking fund for the purpose of retiring the previous bonds, and it is urged by defendant that in such cases the latter issue is not considered as an ''indebtedness'' within the meaning of statutory or charter provisions limiting indebtedness to a certain figure.

This is a matter that has often been before the courts where a limitation placed on the indebtedness of municipal corporations was the issue. While we have not been cited to any decisions dealing directly with the question where the indebtedness involved is that of a private corporation yet we think the reasoning in regard to municipal corporations would apply with equal force to private ones, and especially to those of a *quasi*-public character, such as is the defendant. It is the universal rule that where a municipality issues new securities and exchanges them directly for old ones, or in the payment of a valid existing indebtedness, the transaction is not an increase within the meaning of constitutional and statutory provisions, since the new securities as soon as issued extinguish the old debt, and therefore the aggregate outstanding indebtedness is the same

at all times. *Maish* v. *Arizona*, 164 U. S. 599, 41 L. Ed. 567, 17 Sup. Ct. Rep. 193; *Mitchell* v. *Smith*, 12 S. D. 241, 80 N. W. 1077; *Los Angeles* v. *Teed*, 112 Cal. 319, 44 Pac. 580; *Butler* v. *Lewiston*, 11 Idaho 393, 83 Pac. 234.

When, however, the scheme is for the issuance and sale of new securities in the market, and the proceeds thereof are to be used to pay outstanding indebtedness at a later date, there are two distinct and contradictory rules. The first rule and the reasoning in support thereof is best set forth in the case of *Doon Township* v. *Cummins*, 142 U. S. 366, 35 L. Ed. 1044, 12 Sup. Ct. Rep. 222. We quote as follows:

"There is a wide difference in the two alternatives which this statute undertakes to authorize. The second alternative, of exchanging bonds issued under the statute for outstanding bonds, by which the new bonds, as soon as issued to the holders of the old ones, would be a substitute for and an extinguishment of them so that the aggregate outstanding indebtedness of the corporation would not be increased, might be consistent with the Constitution. But under the first alternative, by which the treasurer is authorized to sell the new bonds and to apply the proceeds of the sale to the payment of the outstanding ones, it is evident that if (as in the case at bar), new bonds are issued without a cancellation or surrender of the old ones, the aggregate debt outstanding, and on which the corporation is liable to be sued, is at once and necessarily increased, and, if new bonds equal in amount to the old ones are so issued at one time, is doubled; and that it will remain at the increased amount until the proceeds of the new bonds are applied to the payment of the old ones, or until some of the obligations are otherwise discharged.

"It is true that if the proceeds of the sale are used by the municipal officers, as directed by the statute, in paying off the old debt, the aggregate indebtedness will ultimately be reduced to the former limit. But it is none the less true, that it has been

increased in the interval; and that unless those officers do their duty, the increase will be permanent. It would be inconsistent alike with the words, and with the object, of the constitutional provision, framed to protect municipal corporations from being loaded with debt beyond a certain limit, to make their liability to be charged with debts contracted beyond that limit depend solely upon the discretion or the honesty of their officers.''

This case has been followed in several jurisdictions. *Anderson* v. *Orient F. Ins. Co.*, 88 Iowa 579, 55 N. W. 348; *Birkholz* v. *Dinnie*, 6 N. D. 511, 72 N. W. 931; *State* v. *McGraw*, 12 Wash. 541, 41 Pac. 893.

The weight of authority, however, is contrary to the doctrine laid down in the Doon case, *supra*. That case was decided by a divided court, and the dissenting opinion has generally been followed. The majority rule is apparently based upon two propositions. While admitting a double indebtedness does actually exist, technically speaking, for a short time at least, it is urged, first, that it is presumed that the officers of a corporation will do their duty and apply the proceeds of the second bond issue to the indebtedness to be refunded; and, second, that the contrary rule would in many cases make it impossible to refund the debts of a corporation. *Veatch* v. *Moscow*, 18 Idaho 313, 21 Ann. Cas. 1332, 109 Pac. 722; *State* v. *Walker*, 193 Mo. 693, 92 S. W. 69; *Palmer* v. *Helena*, 19 Mont. 61, 47 Pac. 209; *Poughkeepsie* v. *Quintard*, 136 N. Y. 275, 32 N. E. 764; *Snyder* v. *Kantner*, 190 Pa. 440, 42 Atl. 884; *National L. Ins. Co.* v. *Mead*, 13 S. D. 37, 79 Am. St. Rep. 876, 48 L. R. A. 785, 82 N. W. 78; *Miller* v. *School Dist.*, 5 Wyo. 217, 39 Pac. 879.

The question is not entirely free from difficulty. We are inclined, however, to believe the majority rule is the best founded on reason. The purpose of constitutional, statutory, and charter provisions

limiting the indebtedness of corporations is obviously the confining such indebtedness within prescribed limits, and not the prevention of the embezzlement or misappropriation of corporate funds; nor are we to assume that corporate officers are always or even usually dishonest. The contrary is to be presumed by a court, and we think the legislature had the same belief. Such being the case, if the proceeds of funding bonds are properly applied, and the presumption is that they will be, the transaction may be in form an increase of indebtedness, but in substance it is not different from what it would be had there been an actual exchange of the new bonds for the old. The contemplated purpose and actual result are the same. The corporate liability is not increased, but merely suffered to remain as it was. The purpose of a constitutional provision, particularly, is always to be considered in determining its true meaning, and we hold, therefore, that where bonds are issued by a corporation for the purpose of refunding other outstanding indebtedness, and where the proceeds of such refunding bonds are placed in a trust fund for the sole and express purpose of paying off the original indebtedness, the latter bonds, so far as the amount which is placed in the trust fund is concerned, are not to be considered as an increase in the indebtedness of the corporation within charter and statutory provisions limiting it.

The same principle of reasoning applies to the provisions of the Horse Mesa Trust Indenture. It is admitted in the complaint in intervention that if the proceeds of the million dollar bond issue of 1928, when deposited in a trust fund as above, shall be considered as canceling to that extent the outstanding bond issue of 1927, the total indebtedness of the association will not be in excess of the amount permitted by the terms of the trust deed. We are of the opinion that on principle the amount deposited

in the trust fund as aforesaid should be considered as in effect reducing the indebtedness of the association on the bond issue of 1927 by the amount so deposited, and, if such be true, the bond issue of 1928 and the assessments levied to secure its payment do not violate the terms of the Horse Mesa Trust Indenture.

This covers in substance all of the objections raised to the proposed bond issue. It appearing to us that none of them are well taken, the judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.