[Civil No. 3330.  Filed March 28, 1933.]

[20 Pac. (2d)  441.]

RAY SAYLOR, Appellant, v. HOLLIS B. GRAY, Appellee.

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellant.

Messrs. Sloan, McKesson & Scott, for Appellee.

ROSS, C. J.—The plaintiff Gray and the defendant Saylor were rival candidates for the office of governor of council district No. 8 of the Salt River Valley Water Users' Association at the general election held by said association on April 5, 1932. The election board, to wit, the board of governors of said

association, canvassed the returns, declared Saylor elected, and ordered its clerk to issue to him a certificate of election, after which he duly qualified and assumed the duties of the office. The complaint is in the nature of a common-law action of *quo warranto* as modified by statute. Sections 4405–4409, Rev. Code 1928. The board's canvass gave Saylor 12,462 and Gray 9,803 votes. The trial court found that of the votes credited to Saylor by the canvassing board 4,363 were illegal, leaving his legal vote at 8,099; and of the votes credited to Gray 158 were illegal, leaving his legal vote at 9,645, or 1,546 more votes than his rival, and gave judgment ousting Saylor. The latter has appealed.

The questions presented would seem very simple and easy to decide, but who are legal or qualified electors of the association, as we shall see, has many angles and is much involved. The reason the court rejected the 4,363 votes cast for defendant and the 158 cast for plaintiff was that they were voted by corporations and other owners, not directly but by their grantees. The method pursued by these owners of acreage and shares of stock in the association was as follows: They would convey title to third parties for the sole purpose of enabling such grantees to qualify to vote their lands and shares at a particular election or elections. These conveyances would be recorded with the county recorder of Maricopa county and from such records a register of voters was made up by the association's secretary and all persons appearing on such register were allowed to vote. All the land voted was in the name of the person who cast the vote for it for at least twenty days before the election. Either at the time of accepting deeds or after the election such grantees would reconvey the premises to the true owners. The register of voters compiled from the recorder's

office was accepted by the election board, and all persons whose names appeared thereon as owners were permitted to vote.

Article VII of the association's charter undertakes to prescribe who are qualified electors in elections held by the association. It reads as follows:

"Section 1. At all elections the electors shall possess the following qualifications:

"(1) Shall be at the time of the election the owner of at least one share of the capital stock of this Association, and shall have been the owner thereof, as shown by the books of the Association, for at least twenty days before such election.

"(2) Shall be of the age of twenty-one years or more and of sound mind.

"Section 2. At all elections each shareholder shall be entitled to one vote for each share of stock owned by him, not however to exceed in the aggregate one hundred and sixty votes, and no more.

"Section 3. The votes shall be by written or printed ballot, and be voted only by the electors at the polls in person.

"Section 4. The Council may make reasonable by-laws for the registration of voters and the method of holding elections.

"Section 5. At all elections the person receiving the highest number of votes for any office shall be deemed elected to such office."

The defendant claims that all corporations, guardians, executors, administrators, trustees and persons who are shown by the registration books of the association to be the owners of a share or shares of the capital stock of the association for twenty days prior to any election may vote not to exceed in the aggregate 160 votes, and that if they own more than 160 acres they may deed the excess to another person or persons for the purpose of having such person or persons vote it, but in no case to exceed 160 votes per person; whereas, the plaintiff takes the position that only those land and share holders

may vote who are the fee-simple owners of lands and who were registered as such twenty days before the election, and in no event more than 160 votes.

The defendant, to sustain his contentions, relies upon the statutes and the general law controlling or granting the right to vote to shareholders of corporations of purely private character; and that necessitates an inquiry into the history and purposes of the Salt River Valley Water Users' Association and the character of its membership.

The association was incorporated in January, 1903, by the owners of land in what is known as the "Salt River Reservoir District," under the laws of the then territory of Arizona, for the purpose of representing such land owners in securing a contract from the Secretary of the Interior (representing the government) to construct a dam (now known as the Roosevelt dam) and irrigation works under the Reclamation Act of June 17, 1902 (32 Stat. 388), and thereafter to deliver irrigation water to the land owners of the district. Although the law at that time required only that articles of incorporation contain the names of the corporators, the name of the corporation, its principal place of transacting business, and the general nature of the business proposed to be transacted, the association's articles went far beyond that. Besides including the corporate powers it took under the statutes, it entered into contractual relations with the government on behalf of the land owners, under and by the terms of which it bound itself and the land owners to conform to the Reclamation Act and the rules and regulations promulgated thereunder by the Secretary of the Interior. Thereunder the government was to furnish funds for and to construct the dam and the irrigation works. Sections 4 and 5 of the Reclamation Act recognize that the reservoir district might contain

unpatented lands and lands in private ownership, but in both cases provide that no right to the use of water for land shall exceed 160 acres to any one land owner, who must be "an actual *bona fide* resident on such land, or occupant thereof residing in the neighborhood of said land." 43 U. S. C. A., § 431. In section 4 (43 U. S. C. A., § 419) the Secretary of the Interior is authorized to limit the area per entry to an acreage which in his opinion "may be reasonably required for the support of a family upon the lands in question." The limitation of the right to have water for irrigation purposes to only 160 acres in accordance with the policy of the Reclamation Act was recognized in the association's charter. It was provided that shares of stock should be inseparably appurtenant to land, at the rate of one share per acre. Section 5 of article V of said charter reads:

"The ownership of each share of stock of this Association shall carry, as incident thereto, a right to have delivered to the owner thereof water, by the Association, for the irrigation of the lands to which such share is appurtenant."

The shares were to be paid for by the owners thereof assuming and paying to the government, when ascertained, their proportionate part of the cost of the installation of the irrigation plant. The reservoir district was divided into ten administrative districts, from each of which was to be elected by popular vote annually a governor. Each of these districts was represented by three councilmen elected by the electors of the district. The board of governors, as to its duties, is comparable to that of a board of directors of the ordinary private corporation; and the councilmen are vested with certain legislative functions. The election of officers, as also elections on bond issues and special assessments, are

held at regular polling places and the secrecy of the ballot is provided for. The board of governors is given "the power to estimate, make and levy assessments against the shareholders of this association." When special assessments are proposed they must be approved by a majority of the shares of the association appurtenant to the lands affected by such assessment.

It is provided that the council shall have power to make and enforce necessary by-laws for the making, levying, collecting and enforcing of assessments, and that assessments shall be liens on the lands of the shareholders.

At the time the association was incorporated, Arizona had no irrigation district act that might or could have been employed by the land owners in securing the contract with the government to construct the dam and reservoirs. The land owners and their advisers were of necessity forced to proceed, under the general incorporation act of the territory, to create an agency to represent them in their dealings with the government.

We have heretofore had occasion to discuss the powers of the association but have not attempted to classify it either as a private or public corporation. In *Orme* v. *Salt River Valley Water Users' Assn.*, 25 Ariz. 324, 217 Pac. 935, we referred to it as "a mutual irrigation district, *quasi* public in character." In *Citrus Growers' Development Assn.* v. *Salt River Valley Water Users' Assn.*, 34 Ariz. 105, 268 Pac. 773, we said:

"It can probably be best described as a private corporation with a public purpose, and having *quasi*-governmental powers."

Not much reflection is needed to discover the wide difference between the powers ordinarily exercised by a private business corporation and those exer-

cised by the association. Some of these we will point out and emphasize as we go along.

The first contention of defendant is that article VII of the association's charter, quoted above, does not expressly prohibit corporations, guardians, etc., from voting their lands and shares of stock. It does, however, provide that only owners of at least a share of the capital stock shall be permitted to vote and that voting shall be by ballot cast "at the polls in person." In the Orme case, *supra,* we held that corporations, guardians, etc., under the charter were not qualified voters, and in so holding we necessarily construed said article as requiring the elector to be the owner of lands in fee simple and not as a fiduciary, and also that he be a person and not a corporation. Considering the business of the association and its undertakings with the government, we think there is no doubt of the association's right to prescribe the qualifications of its members as electors, and to deny the right of those not possessing such qualifications to participate in elections held by the association. The evident purpose of limiting the right to vote to those members of the association possessing the qualifications as indicated was to carry out the clearly expressed intention of the Congress as contained in the Reclamation Act, and to confine the right thereby conferred as much as possible to acreage capable of supporting a family. This is indicated by the "Instructions" issued on July 11, 1913, by the Secretary of the Interior, in which he says: "These lands are to be the homes of families. This seems to be established conclusively by the fact that we are authorized to fix the farm unit on the basis of the amount of land that will support a family." 42 Land Dec. 250. See, also, Pleasant Valley Farm Co., 42 Land Dec. 253. This object might well be defeated if the right to vote were extended to all

owners of land and stock to the full extent of their possessions.

The defendant contends that the construction of the charter by this court in 'the Orme case, *supra,* no longer obtains for the reason that the association on February 24, 1923, amended its charter by extending its life for twenty-five years from that date; that the effect of such amendment was as though it had accepted from the state a new charter, subject to the laws of the state governing private corporations in existence at the time of renewal, and not the laws at the date of its original organization. This question is purely academic under the facts in this case and its decision therefore is not necessary. If the association was engaged in the business of an ordinary private corporation, and if the renewal of its charter had the effect of accepting a new charter from the state, it may be conceded that its charter powers would be found in the laws in existence at the time of the renewal (section 3, art. 14, Const.), and paragraph 2115 of the Revised Statutes of Arizona, 1913 (section 585, Rev. Code 1928), reading: "In all elections for directors or managers of any corporation, each shareholder shall have the right to cast as many votes in the aggregate as he should be entitled to vote under its charter, multiplied by the number of directors or managers to be elected at such election; each shareholder may cast the whole number of votes, either in person or by proxy, for one candidate, or distribute such votes among two or more of such candidates, and such directors or managers shall not be elected otherwise," would be, as defendant contends, controlling. But as we view it, said provision of the statute was not intended to reach elections of the kind here involved. It refers to the right of a shareholder to vote for "directors or managers," and not to a governor of the corporation; a shareholder whose certificate of shares represents his

interest in the capital stock of the corporation, and to surplus and profits; one who may sell and transfer his shares without let or hindrance; one the validity or status of whose shares is not dependent upon his being one of an aggregation of persons with a common purpose or interest to be subserved by the corporation; and one who is entitled to dividends in money.

The status of a shareholder in the association is widely different. His right to vote is made to depend upon his owning lands in the irrigation district, to which his stock is inseparably attached, and can only be transferred with the land. His rights are limited to a participation in the use of water available for irrigation. If he is not the owner of land, he cannot own stock in the association. His stock represents a water right. *Slosser* v. *Salt River Valley Canal Co.,* 7 Ariz. 376, 65 Pac. 332. He or his predecessor must have been a *bona fide* appropriator, or entitled to appropriate some of the public waters of the state. He has a water right inseparably appurtenant to his land. It is quite clear that his rights are very different from those of a shareholder in an ordinary private business corporation, and that the provisions of paragraph 2115, *supra,* authorizing proxy voting, do not affect or change the association's charter forbidding proxy voting of water rights.

Nor do we think there is any merit to defendant's contention that land owners' constitutional rights will be invaded by granting them water rights for only 160 acres while subjecting their entire acreage to district assessments according to benefits. In *Nampa & Meridian Irr. Dist.* v. *Petrie,* 28 Idaho 227, 153 Pac. 425, the attack was upon the contract about to be entered into between the irrigation district and the government, and the court there said:

"The contract proposed to be entered into between the United States and the Nampa & Meridian irri-

gation district, as before stated, provides that the district will distribute the water to the purchasers of water rights under the acts of Congress and the regulations of the Secretary of the Interior, *supra*. This provision of the contract is strenuously protested against by appellants for the reason, as they contend, that a landowner within the district who owns land in excess of 160 acres would be forced to dispose of all the lands he possesses in excess of 160 acres, or suffer the consequences of being taxed for all his lands, yet be denied water for the same in excess of 160 acres. The restriction under the above regulation is to the use of the water. The landowner who has land in excess of 160 acres may permit the whole thereof to be assessed with a government water right, rather than insist that only 160 acres be so assessed, as, although he might be able to secure only enough water to irrigate 160 acres for his own use, the balance of his land would be provided with a permanent water right which he might dispose of within a reasonable time. . . . "

See, also, *Shoshone Irr. Dist.* v. *Lincoln Land Co.*, (D. C.) 51 Fed. (2d) 128.

Another and perhaps a stronger reason why the general powers conferred on private corporations are not applicable to the association is the assumption by the latter, through its board of governors, its council, and its stockholders of the sovereign power of the state to levy and assess taxes and special assessments against the lands of its members, and to make such levies and assessments liens upon their property; also voting bond issues and pledging their lands to pay same and interest. These powers the association has been exercising and we have sustained them. *Orme Case, supra; Citrus Growers' Case, supra; Greene & Griffin Real Estate & Inv. Co.* v. *Salt River Valley Water Users' Assn.*, 25 Ariz. 354, 217 Pac. 945; *Bethune* v. *Salt River Valley Water Users' Assn.*, 26 Ariz. 525, 227 Pac. 989.

We are forced to the conclusion that the association, when it comes to classifying it, is "neither fish nor flesh nor good red herring." It is a unique entity carrying on its business of both a public and a private character under two kinds of authority: One obtained from this state and the other through contract with the government and its stockholders. So, it is seen that it is impossible to apply to the association's business and problems only the powers it obtained by its charter, or the powers, rights and duties conferred on it by its contracts with the government. If it is to be permitted to continue to exercise the powers and privileges necessary to an efficient operation, it cannot be classified and governed as either a private or a public corporation. It really is exercising to a large degree the powers of an irrigation district of the kind that may be organized under the irrigation laws of the state (section 3324 et seq., Rev. Code 1928, as amended), especially in the matters of taxation and bond issues and in the election of its officers by popular vote. As is said in the *Orme case, supra,* it is "a mutual irrigation district." It was really and in fact organized to secure irrigation water for the lands of its members, under such terms and conditions as the Reclamation Act empowered the Secretary of the Interior to prescribe; and its powers and duties are largely those conferred and imposed by the secretary in the contract with the association and its members as set out in its charter.

We think the defendant confuses the right to own land and water rights in the reservoir district with the right to vote. These are not correlative rights. The lands and the appurtenant water rights in the project are alienable and corporations and persons may acquire by purchase or otherwise as many acres as they choose, but they are not entitled to have

water for more than 160 acres of their holdings, and the number of votes they are entitled to cast when qualified to vote is limited to the number of acres that may be supplied with irrigation water. This is necessary if the policy of the government, limiting the right to water to an acreage "reasonably required for the support of a family," is to be made effective.

It is next contended that the court should have accepted the register of voters as made by the secretary of the association as conclusive evidence of the right of all persons thereon to vote the shares assigned them. The register contained the names of the record title owners of land of the district as they appeared in the records of the office of the county recorder at least twenty days before the election. This public record was accepted by the secretary of the association as conclusive evidence of the record owner's right to vote, as had been the practice for many years, although it is an undisputed fact that the votes rejected by the court were cast by "dummy" owners, as heretofore explained.

It may be, as defendant contends, that when the charter or by-laws of an ordinary business corporation provide the manner and time of making up a list of its stockholders for voting purposes, as also the time and method of correcting such list, that such method is exclusive. But, as we have seen, the association is not the ordinary private corporation and therefore such a rule is not applicable to it.

In 1908 "the question was presented (to the board of governors) as to the standing in the approaching election of persons holding property by bonds or bond for deeds," which was answered by the passage of the following resolution: "The evidence of ownership of lands and appurtenant shares of stock of this Association to authorize the entry of the name of the owner upon the register of voters for election pur-

poses, shall be the record of a deed in the recorder's office, conveying the lands to the assumed owner in fee simple, and the grantee or grantees named in such deeds shall be deemed the owners for that purpose." If this resolution is given the effect it imports and as defendant contends it should be given, then the bars are let down and owners who clearly could not directly vote their lands and water rights could by the subterfuge of deeding to "dummies" vote the full extent of their holdings, even though they amounted to thousands of acres, thereby making it possible for a few persons, or concerns, to control the whole project—something which both the spirit and letter of the Reclamation Act and the agreement with the government forbids. The resolution condemns itself in undertaking to qualify the "assumed owner in fee simple" as a voter. Clearly the practice of allowing assumed owners to vote water rights, although of long standing, would not make it legal, or make a voters' register conclusive evidence that such persons, although therein listed, were qualified voters. We conclude the court did not commit error in going back of the register of voters and taking evidence of the qualifications of such registered voters.

One of defendant's assignments concerns the burden of proof. It is contended by defendant that since he received from the canvassing board a certificate of election, it was incumbent upon plaintiff to overcome by a preponderance of the evidence the presumption that he received a majority of the legal votes cast, and he asserts under the evidence plaintiff did not sustain this burden. The court's findings are not questioned. One of such findings is "that the said Gray received a majority of 1,546 of the legal votes so cast." We must assume that this finding is supported by the evidence and, if so, plaintiff sustained the burden cast upon him.

Defendant also claims that the court committed error by violating the secrecy of the ballot in requiring or permitting witnesses to disclose for whom they voted. The charter does provide for a secret ballot at the association's elections, but such provision would not be a public law unless the association was delegated the power by the state to pass it. It illustrates, however, the conception the association has of its capacity as a public agency. The provision does not have the effect of law and we do not enter into a discussion of it from that angle. All of the decisions cited involved the power and right of the courts, where the public laws provided for the secrecy of the ballot, to require or compel a witness to disclose how he voted when the question of the legality of the vote was at issue. However, we know of no law, rule or decision that would exempt a witness from disclosing how or for whom he voted when there is no public law requiring the secrecy of the ballot.

We have not taken up and discussed separately all of the assignments made by the defendant, but we have carefully considered them and believe that what we have said makes it unnecessary to enter into a discussion of those not specifically mentioned.

The judgment is affirmed.

LOCKWOOD and McALISTER, JJ., concur.