## YUMA COUNTY WATER USERS' ASSOCIATION ET AL. *v.* SCHLECHT ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 268. Argued February 28, 1923.—Decided April 30, 1923.

1. Preliminary, tentative opinions of the cost of constructing projected irrigation works, expressed by government engineers and officials in official correspondence and in statements at a meeting of prospective water-users, do not constitute the estimate of cost, or the public notice, required by § 4 of the Reclamation Act, and, though relied upon by the water-users in subjecting their lands to the project, do not bind or estop the Government from afterwards fixing the construction charges against the lands pursuant to the statute, in accordance with a higher estimate arrived at in the light of further investigation and experience. P. 143.

2. The Reclamation Act, § 4, contemplates a precise and formal public notice, stating the lands irrigable under a project, the limit of area for each entry, the charges per acre, the number of annual instalments, and the time when payments shall commence. P. 144.

3. The determination by the Secretary of the Interior of the practicability of a project and the making of the construction contracts are conditions precedent to the estimate of cost and the public notice, under § 4 of the act. P. 145.

4. The time within which the notice shall be given, after the occurrence of these conditions, is left to the sound discretion of the Secretary; and he may delay the notice while the question of cost remains in doubt. P. 145.

5. A contract between the Government and a water-users' association provided for payment of the first instalment of charges at the time of completion of proposed· works, and reserved the right of the Secretary of the Interior to make such changes of the plans " as further investigations and circumstances " might " dictate to be requisite for the public welfare ". *Held,* that the works were not to be deemed incomplete either (a) because a small part of the drainage system was unfinished, the effectiveness of the system not being thereby detracted from, or (b) because two of three tracts which the Government undertook to reclaim were eliminated by the Secretary, in the exercise of his discretion, greater areas having been substituted which more than counterbalanced any injury that otherwise might have-resulted to complaining water-users in the matter of increased assessments.   P. 146.

6. Concurrent findings of fact of the District Court and the Circuit Court of Appeals, sustaining a determination of the Secretary of the Interior that reclamation works had been completed when public notice was given under § 4 of the Reclamation Act, must be accepted by this Court, in absence of clear error.   P. 146.

275 Fed. 885, affirmed.

APPEAL from a decree of the Circuit Court of Appeals affirming a decree of the District Court, which dismissed, upon the merits, a suit to restrain officials of the Reclamation Service from taking steps toward the enforcement of charges for construction cost, under the Reclamation Act.

*Mr. Thomas D. Molloy* for appellants.

*Mr. Assistant Attorney General Riter,* with whom *Mr. Solicitor General Beck* was on the brief, for appellees.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The Yuma County Water Users' Association is a corporation organized primarily to represent the settlers on the Yuma Irrigation Project in Arizona in their dealings with the Government.  The other appellants are shareholders and owners of tracts of land under the project.

On April 8, 1904, the Secretary of the Interior received the report of a board of consulting engineers, made at his request, giving alternative estimates of the cost of the project, and recommending that $3,000,000 be set aside for construction. This report was followed by a letter from the Director of the Geological Survey, joining in the recommendation and, among other things, saying:

" In general the reports indicate that by means of construction of a dam across Colorado River and other works, it will be possible to reclaim upwards of 85,000 acres of land at a cost of less than $40 per acre. . . .

" The land is extremely fertile in character, the climate is somewhat tropical, and the products have such value per acre that it is believed that the cost of $40 per acre is not prohibitive.

" There are a large number of alternatives to be considered and difficult problems to be solved, but the matter has developed from the engineering side to a point where it is possible to consider the larger features and to set aside provisionally a sufficient sum of money to carry out the work contingent upon satisfactory arrangements being made with the owners of lands and vested rights and the complete solution of other matters now pending."

The Secretary, on May 10, 1904, replied approving the recommendation. Correspondence ensued between the Water Users' Association and the officials of the Reclamation Service, and on May 28, 1904, a meeting between them was had. It does not seem necessary to give the details of this correspondence or of the meeting. It suffices to say that, throughout, the officials declared that in their opinion the project would cost at the rate of about $35 per acre, and the water users joined in the enterprise under that belief. True, it was stated that this sum might be increased or lessened as the work progressed and the opinion was otherwise qualified; but it was evidently thought that the cost would not depart

from the figures given to any great extent one way or the other. Thereupon the land owners subscribed for shares in the association, binding themselves to pay the cost of the project in proportion to their interests and pledging their lands as security to that end.

On May 31, 1906, the association, acting for its shareholders, entered into an agreement with the Government by which it was stipulated: that the Secretary should determine the number of acres capable of irrigation under the project; that payments should be divided into not less than ten equal annual installments, the first payable at the time of the completion of the works, or within a reasonable time thereafter and after due notice from the Secretary; and that the cost per acre should be equal throughout the district. And the association agrees " that it will promptly collect or require prompt payment in such manner as the Secretary of the Interior may direct, and hereby guarantees the payments for that part of the cost of the irrigation works, which shall be apportioned by the Secretary of the Interior to its shareholders. . . ." The contract is silent as to the amount of the cost and nowhere suggests that it had already been fixed.

It does not appear that a definite plan of construction was determined upon until after the meeting in 1904; the report of the engineers contains no estimate in respect of the works as they were finally constructed; and no construction contract was made until June, 1905. In the process of construction, great and unexpected difficulties were encountered. The contractors finding themselves unable to proceed, abandoned their contract and the Government was forced to take upon itself the burden of completing the work. The ultimate cost was more than double what had been anticipated. The project was finally completed, as found by both lower courts, on April 6, 1917, and on that date public notice was given

by the Secretary, imposing upon the water users a construction charge of $75 per acre. This notice complies with the provisions of § 4 of the Reclamation Act, 32 Stat. 388, 389, c. 1093, printed in the margin.[1]

Appellants (plaintiffs) brought suit in the United States District Court for the District of Arizona to enjoin the defendants, who were officials of the Reclamation Service, from putting into operation the determination of the Secretary so as to exact a greater sum than $35.28 per acre. The court, after a trial, found in favor of the Government and dismissed the bill and its action was affirmed by the Court of Appeals (275 Fed. 885), from whose decree the case comes here by appeal.

The pleadings are voluminous, much testimony was taken at the trial and a large number of errors have been assigned. After eliminating from consideration those matters which are clearly immaterial or without merit, two questions remain. They are:

---

[1] " Sec. 4. That upon the determination by the Secretary of the Interior that any irrigation project is practicable, he may cause to be let contracts for the construction of the same, in such portions or sections as it may be practicable to construct and complete as parts of the whole project, providing the necessary funds for such portions or sections are available in the reclamation fund, and thereupon he shall give public notice of the lands irrigable under such project, and limit of area per entry, which limit shall represent the acreage which, in the opinion of the Secretary, may be reasonably required for the support of a family upon the lands in question; also of the charges which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project, and the number of annual installments, not exceeding ten, in which such charges shall be paid and the time when such payments shall commence. The said charges shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably: *Provided*, That in all construction work eight hours shall constitute a day's work, and no Mongolian labor shall be employed thereon."

(1) Whether the report, correspondence and statements made in 1904 constituted an estimate of the cost of the project and a public notice, under the terms of § 4; and, if not, whether the notice of 1917 may be so regarded?

(2) Whether the project was completed on April 6, 1917, within the meaning of the contract of 1906?

First. It is contended by appellants that the report of the engineers, the correspondence among the officials and with the Water Users' Association and the statements made at the meeting in 1904, taken together, constitute an estimate of cost binding on the Government, and, though informal, a compliance with § 4 as to public notice. That it was the firm belief of the government officials that the cost of the project would not greatly, if at all, exceed $35 an acre, and that their opinion to that effect was given to the Water Users' Association, by the documents and statements referred to, does not admit of doubt. It seems clear that the water users relied upon these expressions of opinion, and it may be assumed that if they had known in the beginning that the cost was to be as much as $75 per acre they would not have gone forward with the enterprise. But however confidently these opinions were expressed and however much they may have influenced the water users, the attendant circumstances, the language employed and the statutory requirements all preclude the idea that they constituted an estimate of the cost as contemplated by the statute. No element of fraud or bad faith is shown or suggested. The Reclamation Act sets aside all money received from the sale and disposal of public lands in certain States and Territories named for the reclamation of the arid lands therein; and this fund is to be kept intact as nearly as possible by collecting from the water users under each project the estimated cost of the construction thereof. See *Swigart* v. *Baker,* 229 U. S. 187, 197. The extent to which the fund will be preserved, obviously, will depend

upon the accuracy of the estimate, and this in turn, will depend upon the care exercised in securing information upon which to base it. Investigation as to the feasibility of any project, opinions of experts and collection of data relating to the question of cost must precede such an estimate, and § 4, moreover, requires that the charges against water users shall not be assessed until after construction contracts shall have been made, the evident purpose being to put the Secretary in possession of the data furnished by the contracts themselves before he acts in that respect. Prior to the making of the construction contracts, opinions expressed by engineers or officials may be estimates in one sense, but they are tentative and preliminary and cannot be regarded as constituting the required statutory estimate, though contributing to the basic facts upon which it is made. See *Payette-Boise Water Users' Ass'n.* v. *Cole,* 263 Fed. 734, 738–739. The statute contemplates a precise and formal public notice which must state the lands irrigable under the project, the limit of area for each entry, the charges to be made per acre, the number of annual installments and the time when the payments shall commence. The opinions, correspondence and statements relied upon do not fulfill the statutory requirements and we must hold that the Government is neither bound nor estopped by them. *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 408–409; *Pine River Logging Co.* v. *United States,* 186 U. S. 279, 291; *Whiteside* v. *United States,* 93 U. S. 247, 256–257; *The Floyd Acceptances,* 7 Wall. 666, 676; *Filor* v. *United States,* 9 Wall. 45, 49; *Hart* v. *United States,* 95 U. S. 316; *Lee* v. *Munro,* 7 Cranch, 366. Moreover, the contract of 1906, made subsequently, expressly provides for payment on the part of the water users " for that part of the cost of the irrigation works which shall be apportioned by the Secretary of the Interior to its shareholders." Plainly this looked forward to

future action on his part and did not rest upon any action already taken.

Following the provisions requiring the Secretary to determine the practicability of the project and to make construction contracts the words are " and thereupon he shall give public notice," etc.   The word " thereupon " is construed by appellants as an adverb of time, meaning immediately thereafter.   But this is only one of its, uses. It is employed more frequently to express the relation of cause or of condition precedent.   It is in the latter sense that it is used here, and its meaning is that the determination as to the practicability of the project and the making of contracts are precedent conditions to the estimate of cost and public notice.   See *Porphyry Paving Co.* v. *Ancker*, 104 Cal. 340, 342.   The notice must follow the coming into existence of the conditions.   The time thereafter within which it shall be given is left, and from the nature of the matter must be left, to the discretion of the Secretary, and whether that discretion has been unreasonably exercised will depend upon the circumstances of each case.   Here it is made plain that performance of the construction contract became impossible and the same was abandoned.   Acting upon its judgment, which so far as the record shows was not unreasonable, the Government then itself undertook the completion of the work.   Physical conditions not originally foreseen were encountered, presenting difficulties and requiring increased expenditures of great magnitude.   It does not appear that these expenditures were made unnecessarily or improvidently; nor is there anything in the record to indicate that the work was not done with reasonable expedition.   The uncertainties arising from the newly discovered conditions, the abandonment of the construction work by the contractors, the changes which were necessitated in the original plans, and the unexpected turn of events in other respects, left the question of cost in such doubt as to justify withholding

the public notice until it could rest on more definite information. The delay, it is true, was long continued but, under all the circumstances, we cannot say as a matter of law, that it was undue or that the Secretary's discretion in respect of the time was unreasonably exercised.

Second. The contract of May 31, 1906, provides that the first installment shall be payable at the time of the completion of the proposed works, and appellants contend that in two respects they were not completed on April 6, 1917, when the public notice was given: (1) that complete drainage for one of the tracts was not provided, and (2) that only one of three tracts which the Government promised to reclaim was reclaimed.

As to the first point, it is sufficient to say that the testimony shows that the contemplated drainage was substantially completed, and fails to show that the small portion left undone detracted in any way from the effectiveness of the system.

As to the second point, the original plans disclose that it was the intention to reclaim the three tracts mentioned, but the Secretary reserved the right to make such changes " as further investigations and circumstances may dictate to be requisite for the public welfare." The elimination, therefore, of the two tracts was within his discretion. Moreover, while these tracts were not reclaimed, other lands of greater area were added to the project which much more than counterbalanced any injury to the water users here concerned that might otherwise have resulted from the omission. The Secretary determined that the project had been completed when the public notice was given and both lower courts concurred in the same finding. These findings will be accepted here in the absence of clear error, which the record before us does not show. *Bodkin* v. *Edwards,* 255 U. S. 221; *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77.

The decree of the Court of Appeals is

*Affirmed.*