## IN RE GOSHEN DISTRICT
## LINCOLN LAND CO. v. GOSHEN IRRIGATION DISTRICT, ET AL.
### (No. 1578; Nov. 19, 1930; 293 Pac. 373)

For the appellant there was a brief by *John L. Sawyer*, of Torrington, Wyoming, and *Mothersead & York*, of Scottsbluff, Nebraska, and oral argument by *Mr. Sawyer, Mr. Mothersead* and *Mr. York*.

For the respondents there was a brief by *W. J. Burke,* of Billings, Montana, and *Reid & More,* of Torrington, Wyoming, and oral argument by *Mr. Reid.*

KIMBALL, Justice.

This appeal presents questions affecting the legality of the assessment of benefits and construction charges by respondent, Goshen Irrigation District, against lands of appellant, Lincoln Land Company, for irrigation works constructed by the United States as a part of the Ft. Laramie Unit of the North Platte irrigation project.

The North Platte Project was one of the first projects undertaken by the United States under the Federal Reclamation Act of June 17, 1902 (32 Stat. 388). The project was divided into the Interstate and Ft. Laramie Units. The Interstate Unit, which is not affected by this controversy, was constructed first. The construction of the works for the Ft. Laramie Unit was long delayed, and not undertaken until 1915. (Report of Reclamation Service, 1915-1916, p. 271). The irrigable lands in this unit include a considerable acreage held in private ownership. In May, 1912, the consulting board made a report recommending commencement of construction on condition that at least 95 per cent. of the owners of deeded lands sign trust deeds, thereby insuring the repayment of the building charges to

the reclamation fund. This recommendation was approved by the Secretary of the Interior, and forms of trust deeds were submitted to the landowners for signatures. (Reports of Reclamation Service, 1911-1912, p. 127; 1913-1914, p. 191). Later, by Section 12 of the Reclamation Extension Act of Aug. 13, 1914 (38 Stat. 689, [43 USCA, Sec. 418]), it was provided:

"That before any contract is let or work begun for the construction of any reclamation project hereafter adopted the Secretary of the Interior shall require the owners of private lands thereunder to agree to dispose of all lands in excess of the area which he shall deem sufficient for the support of a family upon the land in question, upon such terms and at not to exceed such price as the Secretary of the Interior may designate; and if any landowner shall refuse to agree to the requirements fixed by the Secretary of the Interior, his land shall not be included within the projects if adopted for construction."

It seems that the Secretary of the Interior was unwilling to authorize construction of the Ft. Laramie Unit until the deeded lands were pledged for their proportionate part of the cost of construction. For some time, the department was insisting on trust deeds covering 95 per cent. of the deeded lands, as recommended in 1912 by the consulting board, but in October, 1914, the Secretary reduced the requirement to 90 per cent. June 7, 1915, there was made to the director and chief engineer of the reclamation service report "to the effect that 90 per cent. of the irrigable area in private ownership was then subscribed, and shortly thereafter direction was given that final location surveys be made for the purpose of early advertisement of earthwork and the beginning of construction." The first advertisement was made August 7, 1915. (Report of Reclamation Service, 1915-1916, pp. 271, 272).

The appellant, Lincoln Land Company, was the owner of much of the deeded lands included in the Ft. Laramie Unit. For convenience in discussion, the appellant's lands

have been divided into two tracts, one, the Rock Ranch lands, which may be disregarded for the present; the other, the Horse Creek lands, of which we now speak.

On May 12, 1915, the appellant as grantor gave a trust deed of its Horse Creek lands to the Wyoming Trust and Savings Bank. The deed bears the endorsement "Form approved by Secretary of Interior January 21, 1915," and contains these recitals or premises:

"WHEREAS, the lands hereinafter described lie within the limits of the proposed Fort Laramie Unit of the North Platte Project, Nebraska-Wyoming, proposed to be constructed under the act of Congress of June 17, 1902 (32 Stat. 388), known as the Reclamation Act, which with all acts amendatory thereof and supplementary thereto is hereinafter referred to as the reclamation law, are now without sufficient water supply, will require irrigation before they will produce adequate crops, and the Grantor desires to secure ample water rights for the irrigation thereof under the said Unit, and

"WHEREAS, The Grantor desires to make such provisions in accordance with the reclamation law for said lands as will assure perfection of water rights therefor and is willing to conform to the provisions of the Reclamation Extension Act of August 13, 1914 (38 Stat. 686) and particularly the provisions of Sec. 12 thereof, which require an agreement to dispose of all lands owned by it in excess of the area deemed by the Secretary of the Interior sufficient for the support of a family upon the land in question and to comply with the other requirements thereof, and,

"WHEREAS, the Grantor therefore desires to insure construction of the said Fort Laramie Unit under the reclamation law aforesaid of sufficient extent to provide water for said lands and all the lands subscribed and contemplated to be reclaimed by the said Fort Laramie Unit."

It is then in the trust deed declared that the grantor, "in consideration of the premises, the benefits to be derived from the construction of said Ft. Laramie Unit," and one dollar paid by the trustee, conveys to the trustee several thousand acres of described lands, known in the case as the

Horse Creek lands, subject to rights of way required by the United States.

The terms of the trust, so far as now material, may be summarized as follows: The trustee was required to give bonds for deeds to such persons and for such portions of the lands as the grantor should from time to time direct, the bonds to be conditioned on payments of not more than $30 per acre exclusive of improvements and charges for water right from works of the United States; and conditioned further, "that if the United States decides before January 1, 1917, to construct the said Fort Laramie Unit and by January 1, 1922, the Secretary of the Interior determines that any part of said lands covered by such bond are irrigable from and are included in said unit, the obligee, his heirs, administrators, executors, or assigns shall make, within 90 days from the date of such bond, if water right application is then receivable for said lands, or if not then receivable, within 90 days from date when water right application is first receivable therefor, water right application or applications to the United States for the irrigable area of the lands obligated to be conveyed and included in said unit, in accordance with the said Reclamation Law and rules and regulations thereunder, and the acceptance thereof by the United States." It was understood that the grantor could have reconveyed to itself an irrigable area not exceeding 160 acres for which water right application should be made to the United States within the period provided for the making of such application by holders of bonds for deeds. It was further provided that, except as to the 160 acres to be reconveyed to the grantor, "water right application will not be accepted from any one person in excess of the area which the Secretary of the Interior shall determine as sufficient for the support of a family." Upon the fulfillment of the conditions of any bond for deed, the trustee was required to convey to the obligee that portion of the lands obligated to be conveyed "as shall have had water right application in due form made and accepted

therefor.'' Conveyances were to be subject and inferior
to the lien to accrue to the United States by reason of any
water right application. It was further provided that
''after five years from the date of the first public notice
issued under the Reclamation Law affecting said lands,''
all portions of the lands for which no bond for deed had
been given, and all portions for which bond had been given
but for which water right application had not been made
and accepted, should be sold from time to time by the trus-
tee upon the direction of the Secretary of the Interior at
public auction to the highest bidder qualified to make
water right application for the lands sold. The deed sets
forth in some detail the procedure to be followed in carry-
ing out this provision for sales under the direction of the
Secretary of the Interior. The grantor is entitled to retain
possession and receive the rents and profits of the lands,
subject to the provisions of the trust, ''and shall pay all
taxes, charges and assessments that have accrued, or that
during such possession shall accrue, against said lands that
have now or shall hereafter and during such possession be-
come a lien thereon.'' It is provided that on the trustee's
legal disqualification or failure to act, the Secretary of the
Interior, on his own motion, or application of the grantor,
or application of the successors of the United States in
control of the Fort Laramie Unit, may designate a different
trustee.

After construction work on the Ft. Laramie Unit was
commenced, no public notice of construction charges was
given, and for some time after water was available for
irrigation, it was furnished on a rental basis. In 1923,
under state laws, the Goshen Irrigation District was organ-
ized ''to cooperate with the United States under the Fed-
eral Irrigation laws,'' and ''for the assumption, as prin-
cipal or guarantor, of indebtedness to the United States
on account of lands in said district.'' The district includes
lands of the appellant and other lands in Wyoming in the
Fort Laramie Unit.

In 1926, negotiations between the Irrigation District and the Secretary of the Interior resulted in a contract between the district and the United States. The contract, after approval by the Secretary of the Interior and the electors of the district, was signed November 24, 1926. A brief summary of its material provisions follows:

It recited that the district includes about 53000 acres of lands irrigable from the works of the Ft. Laramie Unit constructed by the United States; that no public notice had theretofore been issued affecting the lands or fixing and determining the cost of construction, and that the landowners and entrymen of lands in the district desired to secure the benefits of the Fact Finders' Act, infra, and through the medium of the district to take over the operation and maintenance of the irrigation works and to contract as to the manner of repayment of the cost of construction properly chargeable to their lands. The United States agreed to store water for the irrigation of lands in the district, and the district assumed and agreed to pay to the United States construction charges which should not exceed $4,985,315. The district agreed to pay each year, a construction charge to be determined by multiplying the average rate per acre by the total number of irrigable acres in the district. Both the "average rate per acre" and the "irrigable acres," were to be determined and announced by the Secretary of the Interior following classification of the lands pursuant to regulations promulgated under authority of the Fact Finders' Act. For the purpose of determining the annual construction payment to be made by the district, all irrigable lands were to be in one class, but it was understood that the average rate per acre would be 5 per cent. of the average gross annual acre income which would depend on the classification of the land with reference to its productive value. The annual construction charges to be paid by the district to the United States were to become due on December 1 of each year commencing with the year 1929, with a provision

for the carrying over of part of the charges for the years 1929, 1930, and 1931.

Following the execution of this contract, and on June 8, 1927, the commissioners of the district filed their amended first report by which it was made to appear that they had determined that 51581 acres of land in the district would be benefited to the amount of $100 per acre, by the irrigation works, and assessed the cost of construction, $4,985,000, against the benefited lands, including some 860 acres of appellant's Horse Creek lands, at the rate of $95 per acre, payable in conformity to the plan outlined in the contract of November 24, 1926.

The Lincoln Land Company objected to the inclusion of its Horse Creek lands in the district, and to the assessment of benefits and cost of construction. After trial in the District Court the objections in all important particulars were overruled, and the assessments confirmed. The Land Company appeals. There are many errors assigned in the specifications of error, but most of them are not argued in the brief and are, therefore, deemed to be waived. Automobile Ins. Co. v. Lloyd, 40 Wyo. 44, 49, 273 Pac. 681.

The contentions argued by appellant in this court go to the validity of the assessment of benefits and of cost of construction under the state irrigation district laws and under the due process clauses of the state and federal constitutions. The question raised require consideration of various provisions of both federal and state statutes, in order the better to understand the relation of the state Irrigation District to the federal Ft. Laramie reclamation unit.

The Act of Congress of June 7, 1902 (32 Stat. 388), called the Reclamation Act, authorizes the Secretary of the Interior to withdraw, examine and determine the irrigability of public lands. Section 4 (U. S. C. A. Sec. 419) provides that upon his favorable determination as to any particular area—

"* * * he may cause to be let contracts for the construction of the same, in such portions or sections as it may

be practicable to construct and complete as parts of the whole project, * * * and thereupon he shall give public notice of the lands irrigable under such project, and limit of area per entry, * * * also of the charges which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project, and the number of annual installments, * * *.''

The time of giving public notice after the letting of contracts was left to the discretion of the Secretary of the Interior, and notice might reasonably be delayed until the completion of the project. Yuma Water Ass'n. v. Schlecht, 262 U. S. 138, 43 S. Ct. 498, 67 L. Ed. 909. The act assumes that projects may include lands in private ownership, but, by Section 5, (43 U. S. C. A. Sec. 431) provides that ''no right to the use of water for land in private ownership shall be sold for a tract exceeding 160 acres to any one land owner.''

The Act of Congress of August 13, 1914 (38 Stat. 686), called the Reclamation Extension Act, makes numerous provisions in regard to the time of payment of construction and maintenance charges. Section 12 (43 U. S. C. A. § 418) is quoted above. By Section 5 (43 U. S. C. A. Sec. 499) it is provided, among other things:

''That whenever any legally organized water users' association or irrigation district shall so request, the Secretary of the Interior is hereby authorized, in his discretion, to transfer to such water users' association or irrigation district the care, operation, and maintenance of all or any part of the project works, subject to such rules and regulations as he may prescribe.''

And by Section 7, (43 U. S. C. A. Sec. 477):

''That the Secretary of the Interior is hereby authorized, in his discretion, to designate and appoint, under such rules and regulations as he may prescribe, the legally organized water users' association or irrigation district, under any reclamation project, as the fiscal agent of the United States

to collect the annual payments on the construction charge of the project and the annual charges for operation and maintenance and all penalties."

The Act of Congress of August 11, 1916 (39 Stat. 506 [43 U. S. C. A. Sec. 621 et seq.]), known as the Smith Act, provides for the inclusion of public lands in irrigation districts organized under state laws, and that the cost of constructing and maintaining the works shall be equitably apportioned among lands held under private ownership, lands legally covered by unpatented entries, and unentered public lands included in the district.

Under the Reclamation Act and all amendments prior to May 15, 1922, construction costs on federal projects became due following public notices required by the Reclamation Act and frequently referred to in the Extension Act and other acts not necessary to be mentioned. Upon the issuance of such notices the construction charges specified therein became fixed charges against the lands. (Solicitor's Opinion, 50 L. D. 225) It seems to be conceded that in assessing the cost of construction by public notice, an equal amount is charged against each irrigable acre affected by the notice.

By Section 1 of the Act of Congress of May 15, 1922 (42 St. 541 [43 U. S. C. A. Sec. 511]) it is provided:

"That in carrying out the purposes of the act of June 17, 1902 (32 St. 388), and acts amendatory thereof and supplementary thereto, and known as and called the reclamation law, the Secretary of the Interior may enter into contract with any legally organized irrigation district whereby such irrigation district shall agree to pay the moneys required to be paid to the United States, and in such event water-right applications on the part of landowners and entrymen, in the discretion of the Secretary of the Interior, may be dispensed with. In the event of such contract being made with an irrigation district, the Secretary of the Interior, in his discretion, may contract that the payments, both for the construction of irrigation works and for operation and maintenance, on the part of the district shall be

made upon such dates as will best conform to the district and taxation laws of the respective States under which such irrigation districts shall be formed; and if he deem it advisable, he may contract for such penalties or interest charges in case of delinquency in payments as he may deem proper and consistent with such State laws, notwithstanding the provisions of Sections 1, 2, 3, 5, and 6 of the reclamation extension act approved August 13, 1914 (38 St. 686). * * * *Provided,* That no contract with an irrigation district under this act shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract, with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid.''

By Section 3 of the same act (43 U. S. C. A. Sec. 513) it is provided that public lands included in a State irrigation district and designated in a contract under Section 1, should be subject to all the provisions of the Smith Act of August 11, 1916, above mentioned.

Section 4 of an Act of Congress of December 5, 1924 (43 St. 672, 701) is known as the Fact Finders' Act. It provides for the classification of project lands on the basis of their productivity, and, by Subsec. F (43 U. S. C. A. Sec. 473):

''That hereafter all project construction charges shall be made payable in annual installments based on the productive power of the land as provided in this subsection. The installment of the construction charge per irrigable acre payable each year shall be 5 per centum of the average gross annual acre income for the ten calendar years first preceding, or for all years of record if fewer than ten years are available, of the area in cultivation in the division or subdivision thereof of the project in which the land is located, as found by the Secretary annually. The decision of the Secretary as to the amount of any such installment shall be conclusive. These annual payments shall continue until the total construction charge against each unit is paid * * *.''

The first state irrigation district law that need be noticed was passed in 1920 (Ch. 75, [Sections 951, 996] Wyo. C. S. 1920), and provided (Sec. 951.) that such districts might be organized by freeholders owning lands and entrymen upon public lands who desire to provide for irrigation of the district lands; or to improve the existing water supply; or to purchase, extend, operate or maintain constructed irrigation works; or

"to co-operate with the United States under the federal reclamation laws heretofore or hereafter enacted, or for the assumption as principal or guarantor of indebtedness to the United States on account of district lands."

Districts are organized by petition to and order of the District Court. Secs. 951, 960. The business of the district is managed by a board of commissioners, appointed by the court. Secs. 960, 963. Commissioners are declared to be public officers whose official acts are entitled to the presumption of validity. Sec. 987. It is the duty of the commissioners to assess against the lands in the district "the amount of benefits which they determine will be caused by the proposed work," and to "apportion and assess" the cost of construction "against the several benefited tracts and lots in said irrigation district, in proportion to the benefits which they have assessed against the same, by setting down opposite each tract or lot the sum which they assess against the same for construction." Sec. 964.

The state law contains several provisions for co-operation of districts with the United States. By Section 963, which was last amended by Section 2 of Chapter 53, Laws of 1925, the board of commissioners of the district may make the necessary assurances and representations for the purpose of acquiring control over public lands pursuant to the Smith Act of August 11, 1916, and "may contract with the United States for the construction, operation and maintenance of the necessary works for the delivery and distribution of water therefrom under the provisions of the federal

Reclamation Act, and all acts amendatory thereof and supplemental thereto and the rules and regulations established thereunder, or for the assumption, as principal or guarantor of the indebtedness to the United States on account of district lands.'' Further:

"The Board may contract with the United States for a water supply under any Act of Congress providing for or permitting such contract and in case contract has been or may thereafter be made with the United States as herein provided, * * * it shall be the duty of the board to include as part of any levy or assessment provided for herein, an amount sufficient to meet each year all payments accruing under the terms of any such contract; and the board may accept on behalf of the district, appointment of the district as fiscal agent of the United States, or authorization of the district by the United States to make collection of moneys for or on behalf of the United States, in connection with any Federal reclamation project, whereupon the district shall be authorized to so act and to assume the duties and liabilities incident to such action, and the said board shall have full power to do any and all things required by the Federal statutes now or hereafter enacted in connection therewith, and all things required by the rules and regulations now or that may hereafter be established by any department of the Federal government in regard thereto.''

By Section 8, Chapter 14, Laws of 1923, it is provided that the state statutes relative to the "levy and collection of payments, charges or assessments in Irrigation Districts shall not apply to any district which may be organized within a federal reclamation project for the purpose of co-operation between such district and the United States, provided a different method for the levy and collection of payments, charges and assessments be agreed upon between such district and the United States.'' And, after the passing of the Fact Finders' Act, supra, it was specifically provided, by amendment of Section 973 of the state law, that, in case a contract is made between the United States and an Irrigation District for the construction or sale of irrigation works and water rights, it shall be competent for the court to

order the charges to be paid in accordance with the provisions of the Fact Finders' Act, and all amendatory and supplemental acts, and in such installments as fixed by contract between the district and the United States. Ch. 52, Laws of 1925.

It is conceded that works of the Ft. Laramie Unit constructed by the United States under the federal Reclamation Act are the only source of supply of water for the Irrigation District. Appellant contends that because of the provision of Section 5 of the Reclamation Act, that no right to water for land in private ownership shall be sold for a tract exceeding 160 acres to any one land owner, the Irrigation District cannot legally supply water for appellant's lands in excess of 160 acres, and, therefore, such lands will receive no benefit that can support an assessment for construction charges.

The state irrigation district laws contain nothing to prevent the district from supplying water for appellant's lands in excess of 160 acres. It is contended by district that the prohibition of the federal act has no application after the United States has transferred to a state irrigation district the care and operation of the project works, charging the district with construction costs that include expenses incurred in providing for irrigation of tracts exceeding 160 acres held by one landowner. That question we need not decide, but shall assume for the purpose of this case that the district is bound by the prohibition of the federal act.

Granting, then, that the district cannot legally sell water for irrigation of appellant's lands in excess of 160 acres, we are of opinion that it does not follow that the excess lands are not benefited. The history of the Ft. Laramie Unit, particularly the trust deed of May 12, 1915, shows that appellant in order to conform to the federal laws, and induce the United States to construct the unit works for the benefit of appellant's lands, consented to dispose of its excess holdings pursuant to the plan outlined in the trust deed. After the construction of the unit works whereby

water has been made available for irrigation of the lands, the appellant cannot be heard to say that excess lands which it retains are not benefited.

Appellant's answer to this is that the Secretary of the Interior abandoned the plan outlined in the trust deed by failing to give public notice. It seems to be agreed that no public notice affecting the lands in question has been or will be given. The trust deed, as shown above, provides that ''after five years from the date of the first public notice'' excess lands of appellant that have not been disposed of in accordance with the plan thereinbefore outlined, shall be sold at public auction on the direction of the Secretary of the Interior.

We do not think the Secretary's failure to give public notice ought to have the effect of frustrating the plan for disposal of appellant's excess lands. We do not understand that appellant contends that the cost of construction is any higher, or the terms of payment any harsher, because not declared by public notice. It is probably true that when the trust deed was made, both appellant and the reclamation officers understood that construction charges would be fixed by public notice. It was determined that five years thereafter should be the limit of time appellant should have for disposing of its excess lands. After the expiration of that time, the Secretary was given the right to compel sales at public auction. If there had been no additional federal legislation, public notice would no doubt have been given, and construction charges have become due pursuant to the Reclamation Extension Act. Before the completion of construction work on the Ft. Laramie Unit, additional legislation (Act of May 15, 1922, *supra)* permitted the Secretary. of the Interior to enter into contracts fixing the dates of payment of construction charges by irrigation districts notwithstanding the provisions of the Reclamation Extension Act. See 50 L. D. 142, 223. Other legislation (Fact Finders' Act, *supra)* provided for repayment of such charges in annual instalments based on

the productive power of the land. When, in taking advantage of this new legislation, the amount and terms of payment of construction costs were fixed by the contract of November 24, 1926 between the United States and the Irrigation District, there was no purpose to be served by the public notice provided for in Section 4, *supra*, of the Reclamation Act.

We do not think the trust deed contains anything to show that the giving of public notice was a condition qualifying the arrangement by which appellant, by agreeing to dispose of its excess lands, obtained the benefit of the construction of the contemplated works. The public notice was mentioned as a step in the administration of the federal law whereby it was supposed the cost of construction would be announced and assessed. There was no express stipulation that it would be given. It was merely assumed that it would be given. Nothing was said as to what would happen if it were not given, although the deed provided for reconveyance of the trust lands if other conditions were not fulfilled. If we concede that there was an implied condition that public notice should be given, we see no reason for holding that it was of the essence of the transaction. The condition qualified the Secretary's right to require disposition of the lands. It would seem that it was substantially performed when construction costs were made known and assessed by other legal means. See: Hebert v. Dewey, 191 Mass. 403, 411, 77 N. E. 822; Joseph v. Catron, 13 N. Mex. 202, 81 Pac. 439, 1 L. R. A. (N. S.) 1120.

It seems that the Rock Ranch lands were not included in the trust deed, but the contention that the district cannot legally furnish water for more than 160 acres of those lands is not pressed. The evidence shows some 500 acres of the Rock Ranch lands are now being irrigated from the district works.

The state irrigation district law (Sec. 964, *supra*) provides for assessment of cost of construction against the several benefited tracts "in proportion to the benefits,"

without specifying any rule to be followed by the commissioners in ascertaining the benefits. In the case at bar the commissioners determined that each irrigable acre would be benefited the same amount. Appellant contends that such an assessment does not represent the judgment of the commissioners as to benefits, but is an arbitrary exaction, regardless of benefits, pursuant to the contract of the district with the United States. The actual burden imposed on land owners by the assessment pursuant to the contract of November 24, 1926, cannot be understood without consideration of the terms of payment. In the report of 1924 of the Committee of Special Advisors on Irrigation (Senate Doc. 92, 68th Cong. 1st Sess. p. 54) it was said:

"In considering the acre cost of water right under the Federal irrigation projects, it must be remembered that the cost under public notice is, after all, an apparent cost. The real cost is considerably less. This results from the fact that the repayment period covers many years (under the extension act 20 years) and that during the period of repayment there are no interest charges except against overdue payments. The use of Government money without interest for a relatively long period of time has a direct cash value to the farmer.

"At 4 per cent the interest on the moneys advanced by the Government under the repayment period would amount to more than one-third of the capital invested. The acre charge is therefore really only two-thirds of what it appears to be. * * * It is altogether too common to consider the acre costs on the Federal reclamation projects without reference to the advantage resulting from use of Federal money without an interest charge, when in fact the water user is requested to pay annually an amount equal to 5 per cent on the acre cost and then at the end of the 20-year period is forgiven the capital charge."

In the same report (pp. 4, 147) the committee recommended the plan of repayment adopted by the Fact Finders' Act, *supra*. It is that plan as outlined in the contract of November 24, 1926, that the commissioners followed in

making the assessment of cost of construction in the case at bar.

There were introduced in evidence the departmental reg-ulations that were followed in classifying the district lands. These regulations provided that land classifiers should consider in their examinations "(a) the natural productive power of the soil under good agricultural practice, (b) other conditions that influence productivity such as uneven topography, making irrigation difficult and expensive, alkali, gravel subsoil, hard-pan, water-logging, forest covering, etc., and (c) the distance of the land from railroad and other carriers, and from markets." The combination of these factors determined the class to which a given farm unit belonged. The inherent fertility of the soil and the topography of the land were the two chief factors of consideration. Pursuant to these and other more detailed instructions the lands were required to be classified according to productive power. This was done. There are six classes, of which only the first four are assessed with construction charges. Lands of the fifth class are those not at present susceptible of agricultural use, and lands of the sixth class are those that appear to be permanently non-agricultural under practices of irrigation farming.

After the classification of the lands it was necessary to ascertain the average annual gross acre income from lands of the four classes to be charged with costs of construction. This income, omitting fractions, was $38 for lands of class 1, $33 for class 2, $24 for class 3, and $16 for class 4. On that basis the annual construction charges would be $1.90, $1.65, $1.20, and 80 cents, respectively. If payments are continued at the same rates until the total charges of $95 per acre are paid, the payments reduced to present value, considering money worth 5 per cent., would amount to about $36 for first-class lands and $15 for fourth-class lands.

We are of opinion that the district commissioners in assessing costs of construction in accordance with the above plan, in co-operation with the federal authorities, did not

violate the state statutes. The federal Reclamation Act, Section 4, provides that construction charges "shall be apportioned equitably;" and, so far as we are informed, it has always been deemed equitable in the administration of that act to determine the acre cost by dividing the total cost by the number of irrigable acres in the project.

Special assessments are levied on the theory of special benefits, and apportionment of the total cost among the benefited tracts according to area, frontage or value does not disprove the consideration of benefits if it does not result in manifest injustice and inequality. McGarvey v. Swan, 17 Wyo. 120, 96 Pac. 697. In the case just cited the rule of apportionment was fixed by the legislature. When that has not been done, we do not think it necessarily follows that the tribunal appointed by the legislature to make the assessments must attempt to assess the benefits one by one without some rule or principle of general application that will make the assessments reasonable and proportional according to benefits. See: Sears v. Board of Aldermen, 173 Mass. 71, 53 N. E. 138, 43 L. R. A. 834; Rogers v. City of Salem, 61 Ore. 321, 122 Pac. 308; Jones v. City of Sheldon, 172 Ia. 406, 154 N. W. 592; Worth v. Town of Westfield, 81 N. J. L. 301, 80 Atl. 104; O'Reilley v. City of Kingston, 114 N. Y. 439, 21 N. E. 1004; City of Springfield v. Sale, 127 Ill. 359, 20 N. E. 86; Chicago & N. W. R. Co. v. City of Albion, 109 Nebr. 739, 192 N. W. 233.

We assume that the commissioners of the district had no right to assess the cost of construction pursuant to a rule or principle that would disregard proportionate benefits; but we do not believe they have done that. The record warrants the belief that it was their honest judgment that each irrigable acre would be benefited equally, especially in view of the plan of repayment of which landowners and entrymen were permitted to take advantage by cooperation with the United States. The fact that the assessment on that basis was approved of the authorities who acted on behalf of the United States was entitled to some consideration by the

commissioners and the court in determining whether the charges were assessed equitably. The district was organized for the purpose of cooperating with the United States, and the commissioners were granted broad powers in the making of contracts to further that purpose. There is no reason to suppose that the United States would have agreed to the terms of the contract of November 24, 1926, if the commissioners had insisted on fixing the acre construction charge on a different basis. We do not believe the court would be justified in holding that the assessments have been made on a plan that was unjust or inequitable.

The appellant contended that the assessments complained of were substantially in excess of the actual benefits, but the evidence on that issue was conflicting, and the finding of the trial judge cannot be disturbed. The principal ground for continuing to press the contention in this court is that it was shown without dispute that the market value of the lands has not been increased by an amount equal to the assessments. But this evidence as to the market value of the lands was not at all conclusive. Evidence on behalf of the district justified the finding that, after water was made available for irrigation of the lands, their market value, subject to the assessed charges, was substantially more than their value as arid lands. Often, the benefit contemplated by the statute does not result in an immediate increase in the value of the land, and in many cases of actual benefit it is not possible to prove a corresponding increase in market value. Nampa etc. Irr. Dist. v. Petrie, 37 Ida. 45, 57, 223 Pac. 531, 534; Truckee-Carson Irr. Dist. v. McLean, 49 Nev. 278, 298, 245 Pac. 285, 291.

The judgment appealed from will be affirmed.

*Affirmed.*

BLUME, Ch. J., and RINER, J., concur.