IN RE APPLICATION OF THE FRENCHMAN VALLEY IRRIGATION DISTRICT, A CORPORATION.
THE FRENCHMAN VALLEY IRRIGATION DISTRICT, A CORPORATION, APPELLANT AND CROSS-APPELLEE, V. EARL SMITH ET AL., APPELLEES AND CROSS-APPELLANTS.

91 N. W. 2d 415

Filed July 11, 1958. No. 34340.

*Russell & Colfer*, for appellant.

*Charles M. Bosley* and *Robert C. Bosley*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a special proceeding brought by the Frenchman Valley Irrigation District in the district court for Hitchcock County for the approval of the organization of the district and the proceedings of the board of directors leading up to and including the making of a contract and the validity of the terms thereof, between said district and the United States of America for the sale by the district of its diversion dam and main canal, including easements, rights-of-way, and all appurtenances thereto, except natural flow water rights, and for the

purchase of storage waters through works to be constructed by the United States to supplement the district's natural flow water rights.

For convenience we will refer to the parties as designated in the district court, or to the Frenchman Valley Irrigation District as the district, and the United States of America as the United States.

The issues set forth in the pleadings are in substance as follows.

The plaintiff's petition alleged that the Frenchman Valley Irrigation District, a corporation, was duly organized under and by virtue of the irrigation laws of Nebraska on February 12, 1912, and ever since said date has had a duly elected and qualified board of three directors, and has acted as an irrigation district and conducted its business since said date, with its offices in Culbertson, Hitchcock County, Nebraska; that the said district is located in Hitchcock County, Nebraska; that the United States, through the Department of the Interior, proposed to purchase the district's irrigation system consisting of its diversion dam, main canal, easements, and rights-of-way, and all appurtenances thereto, except existing water rights, and to enlarge and rehabilitate the entire system and provide the district with storage waters from the government reservoir at Enders, Nebraska, to supplement its natural flow of waters from the Frenchman River and Stinking Water Creek; that a contract covering the subject matter was submitted to the board of directors of the district and election was held October 2, 1956, at which the electors of the irrigation district voted in favor of the contract for the sale of the irrigation system to the United States and to contract for a supplemental water supply from the government reservoir; and that on November 7, 1956, a contract was executed by the board of directors and the United States with reference to the foregoing. The prayer was for an order approving and confirming the organization of the irrigation district and the proceedings of the board

of directors leading up to and including the making of said contract, and the validity of the terms thereof.

The defendants, in their answer and objections, alleged that the lands owned by them and other persons likewise situated have been continuously irrigated from the Frenchman Valley Irrigation District and its predecessors in title under the rights and privileges granted in the opinion of R. B. Howell, State Engineer, given and entered under date of December 31, 1895, as based upon findings for the appropriation of waters from the Frenchman River and Stinking Water Creek; and that the water appropriated and owned by said Frenchman Valley Irrigation District is all of the natural flow of the Frenchman River and Stinking Water Creek for the uses and benefits of the lands irrigated by the district. The defendants then set forth certain reasons why they objected to the sufficiency of the notice in calling an election for the purpose of approving or disapproving the contract as stated in the plaintiff's petition, and alleged that certain provisions of the contract violated the Constitution of Nebraska and the Constitution of the United States, particularly Article V of the Amendments thereto, to deprive the landowners and water users in this district of their property without due process of law, and to take private property for a public use without just compensation therefor. The prayer was that the court disapprove and disaffirm said contract.

The plaintiff's reply to the answer, and answer to the objections of the defendants, specifically denied that the water appropriated and owned by the Frenchman Valley Irrigation District was all of the natural flow of the Frenchman River and Stinking Water Creek as alleged in the answer of the defendants, and alleged that the water to which said irrigation district is entitled has been fixed and limited by the Department of Roads and Irrigation of the state; and that the electors of said irrigation district were fully informed in advance of the election held on October 2, 1956, as to the contents of

the contract to be entered into between the Frenchman Valley Irrigation District and the United States. Each and every allegation contained in the said answer and objections, which were not admitted, were denied.

The trial court found that the landowners within the irrigation distrct were entitled to the beneficial use of water for irrigation from the Frenchman River and Stinking Water Creek not to exceed 1 cubic foot per second of time for each 70 acres; that the United States stored water in its reservoir from the Frenchman River during the season of the year when the flow of said river is not used for irrigation; and that by virtue of the appropriations of the district all the natural flow in the Frenchman River and Stinking Water Creek, whether impounded in a reservoir during the nonirrigation season or permitted to flow during the irrigation season, is appurtenant to the lands within said district and the right to said water is vested in the respective owners of the land in the district.

The court decreed the excess-acres provisions contained in articles 16, 17, and 18 of the contract limited and impaired the vested rights of the landowners to use the natural flow and storage waters impounded in the Enders Reservoir without due process of law; and that such provisions, except as to subparagraph a and the last sentence in subparagraph b in article 18, were inapplicable, unenforceable, and void. The court decreed that in all other respects the contract be confirmed, ratified, and approved.

The court further decreed that the organization of the district and the proceedings of the board of directors of said district relating to the election for the sale of the dam, canal, easements, and rights-of-way of the district, including the election, and the proceedings of the board leading up to and including the making of the contract be approved and confirmed.

The plaintiff filed a motion for new trial. The defendants filed a motion for modification of the decree or,

in the alternative, a motion for new trial. Both of the above motions were overruled. The plaintiff appealed and the defendants cross-appealed.

The evidence adduced at the trial consisted of records, testimony offered by the plaintiff, and stipulations as to certain facts. The defendants offered no sworn testimony, and there is little dispute in the facts. The matters in dispute resolve themselves into questions of law. For the purpose of this opinion, the facts may be stated in substance as follows.

The Frenchman Valley Irrigation District is a corporation duly incorporated as an irrigation district on February 12, 1912, to purchase an irrigation system known as the Culbertson Irrigation Ditch, and to operate it under the irrigation laws. Its boundaries are described in the plaintiff's petition and need not be set out as there is no dispute with reference thereto. On March 12, 1913, it purchased the irrigation system and all of the property in connection therewith, including all the title and interest and the water appropriation from the owner thereof. It has operated the irrigation system since that date. The water appropriated was by virtue of notices of appropriation filed by the predecessor in title in 1890, and claim for such water was filed July 18, 1895. On December 31, 1895, the State Board of Irrigation, by R. B. Howell, engineer, found and determined the priority of the appropriation from the Frenchman River and Stinking Water Creek for the lands receiving water under it dated from May 16, 1890, and determined the land to be irrigated amounted to about 15,120 acres. It was adjudicated and determined that the amount of the appropriation should not exceed 215 cubic feet per second; that neither should it exceed the capacity of said canal, nor the least amount of water that experience should thereafter indicate would be necessary for the production of crops, in the exercise of good husbandry; and further, that said appropriation should be limited, as a maximum, to 1 cubic foot per second of time, for each

70 acres to which water has been actually and usefully applied on or before September 1, 1900. The district now comprises 9,331.7 acres susceptible to irrigation.

The capacity of the canal at the present time is such as to allow irrigation every 15 days. The capacity of the new canal will permit irrigation every 10-day period. The water is taken from the Frenchman River at a point north of Palisade. There is a diversion dam at that point. The district's irrigation system is in need of repair. More water is needed by the district than it is getting with its present facilities. The present ditch will not carry the amount of water that can be diverted from the Frenchman River.

The district includes land subject to irrigation rights under the same appropriation which is located in Hayes County, based on the notice of appropriation of the waters of the Frenchman River and Stinking Water Creek filed under date of May 16, 1890.

An adjoining district is referred to in the contract. It is the Frenchman-Cambridge project, a new district, either organized or in the process of being organized, which would receive benefits by using the main canal of the district.

The property of the district proposed to be transferred by the contract is the diversion dam and the main canal. The distribution and lateral system remains in the district for operation, maintenance, and repair by the district.

It was stipulated that defendants own irrigated lands in the district as follows: Earl Smith, 117.47 acres; V. G. (Virgil) Fassler, 110.5 acres; Barbara Wagner, 269.05 acres; Wilbert H. and Patty Lou Wagner, 40 acres; and Nathaniel H. Meeker, Jr. and Gladys E. Meeker, 102.75 acres. Nathaniel H. and Gladys E. Meeker are not residents of the State of Nebraska.

The United States, through the Secretary of the Interior, filed an application with the Department of Roads and Irrigation to store water in Enders Reservoir for

the purpose of flood control and irrigation by the construction of a dam across the Frenchman River. On August 6, 1947, the application was approved subject to the rights of the riparian owners and the water rights of all persons who had acquired a right to the use of water from the river. The government has water stored at Enders by a dam constructed in 1950 in the Frenchman River. There is a device to measure the water as it goes behind the dam, and there is a measuring device for the water as it leaves the dam, so the district gets its natural flow.

The United States, through the Bureau of Reclamation, proposed to purchase the irrigation system of the district, to enter into a contract for the rebuilding and enlarging of the system, and to furnish a water supply to the district. The amount of the repayment contract is based on 20,000 acre feet provided in the contract. This was the average of water used over a period of years. The board had the government's proposal under consideration for several years.

An election was held on October 2, 1956, on the question of the sale of the irrigation works to the government and a contract for water supply. The election was in favor of the sale and contract for a water supply. The contract between the district and the United States was apparently signed November 7, 1956.

The contract provides that the district shall sell its irrigation system to the government, and in return the government will reconstruct and enlarge the system and provide the district with a regulated water supply from its storage reservoir on the Frenchman River at Enders. The contract is not for the sale of water by the government. but is to provide a service in the delivery of water for which reimbursement is to be made based on the cost of the reconstruction and enlargement of the irrigation system. It provides that storage water will not be supplied for more than 160 acres held by any one owner, and that no storage water will be furnished for any acre-

age in excess of that amount unless the owner executes a contract for the sale of the excess acres.

The purchase price of the irrigation district's facilities heretofore referred to is $247,000, payment to be made in the form of 40 annual credits of $6,180 each, to be applied as part of the amount of the district's obligation for water service covering a period of 40 years. The credit is applied on the district's annual service charge of $14,880, leaving the net amount payable by the district in the sum of $8,700. The amount of the service charge or repayment is to enable the government to recover a part of the cost of rebuilding and enlarging the system based on a delivery of 20,000 acre feet of water. The additional amount of water required for the district's needs will vary from year to year. The district will receive its natural flow, but will pay $1.50 per acre foot in addition to the annual service charge for all water delivered in excess of 20,000 acre feet, to give the district its natural flow and additional water above the natural flow to meet its needs and requirements. It was deemed more economical for the district to contract for 20,000 acre feet and thus reduce the amount of the repayment contract, even though it is necessary to pay $1.50 per acre foot above 20,000 acre feet. If the district contracted for a larger amount than 20,000 acre feet, the repayment contract would be increased. If more water is needed, it can be purchased; if not needed, the district will not pay for water under a larger repayment contract that is not used. If the amount for which the district contracts is more than needed, it can be expected that the excess will be wasted. The desire of the government is to conserve water.

The defendants contend in their cross-appeal that the trial court erred in failing to sustain their objection that the notice given by the district was insufficient, and not in accordance with the provisions of law therefor, for the election held in the district upon the contract involved in this cause.

Section 46-129, R. R. S. 1943, provides in part: "Notice of such election shall be given by posting notice thereof in three public places in each of the election precincts in the district for at least twenty days and also by publication of such notice in some newspaper published in the county where the office of the board of directors is kept, once each week for three successive weeks. Such notice shall specify the time and place of holding the election and shall contain a brief summary of the proposition involving the proposed conveyance. Such election shall be held and the result thereof determined and declared in conformity with the provisions of law governing the election of officers in such district, as nearly as may be practicable. No informalities in conducting such an election shall invalidate the same if the election shall have been otherwise fairly conducted."

The record discloses that the secretary of the Frenchman Valley Irrigation District posted notices of the election to be held October 2, 1956, in said district, one copy of the notice in the Bank of Culbertson and one in the United States post office of Culbertson. The posted notices were identical to notices published in two newspapers, namely the Culbertson Progress and Palisade Times.

An affidavit by an employee of the district stated that on September 10, 1956, he posted a notice of election to be held October 2, 1956, in said district, which notice was identical with the published notices in the two newspapers heretofore mentioned. This notice was posted in the Frenchman Valley Bank at Palisade, Hitchcock County, Nebraska.

Without detailing the exhibits relating to the notices given with reference to the election due to the length of the subject matter contained therein, suffice it is to say that the notices of election stated the purpose thereof in a general way by setting forth the question of whether or not the irrigation district should enter into a contract with the United States for the sale of its irrigation sys-

tem, but not including its natural flow rights, for $247,000 payable by giving the district credit in 40 annual installments; that the contract provided for the rehabilitation of the irrigation district and for the delivery of water to the district from storage works to supplement the district's natural flow waters; and that the district pay the United States an annual charge for the delivery of water, less the annual credit to the district. The electors were informed that the proposition to be voted upon involved the sale and a contract with the United States for a water supply.

As noted, the statute requires publication in one newspaper. However, notices were published in two newspapers in the county in order to make certain that the electors were notified of the election to be held. The notices stated that a copy of the proposed contract could be examined at the Bank of Culbertson and at the office of the irrigation district in Culbertson. In addition, it was stated that copies of the contract would be posted at the polling place on the day of the election. Copies of the contract were available to the electors at the Bank of Culbertson and the office of the irrigation district 20 days prior to the election, and there were several copies of the contract at the polling place on election day.

There were three meetings of the electors held prior to the election at which the matter of entering into the contract was thoroughly discussed. The secretary of the district mailed each of the electors a notice of the meetings. The first meeting was held on September 29, 1955. At the meeting, the contract was read and the matter discussed. The next meeting was held on March 16, 1956, at which time the contract was read and discussed, and notice was given to the electors of such meeting. The last meeting was held on September 27, 1956. The electors were given written notice in advance of such meeting. The contract was read and discussed at each meeting. At the meeting in March 1956,

a mimeographed sheet showing the high points of the contract was handed out to the electors. Copies of the same were mailed to the electors with the notice of the meeting.

The question of the sale of the irrigation works and the matter of entering into a contract for water supply with the United States government was a matter of wide interest and was thoroughly discussed by the electors for a period of over a year prior to the election. The board of directors had this proposal under consideration for several years prior to the election.

The requirements for notice of election are contained in several sections of the statutes. In section 46-1,145, R. R. S. 1943, it is said: "If such contract provides for payments to be made extending for a period of more than one year from the date of making the contract, the board of directors of such irrigation district shall submit the contract to the legal voters of the district at any general election, or at a special election called therefor for the approval or disapproval of the contract." It is further provided in this section: "The notice of the election need not give the entire contract but shall be sufficient if it shall state in a general way the substance of the proposed contract." In addition this section provides: "If a special election is called for such purpose the notice of election, conduct of the election and canvass of votes shall so far as practicable be the same as elections held for the purpose of voting upon the issuance of bonds."

Section 46-194, R. R. S. 1943, provides in part: "Notice of such election must be given by posting notice in three public places in each election precinct in the district for at least twenty days, and also by publication of such notice in some newspaper published in the county where the office of the board of directors of such district is required to be kept, once a week for at least three successive weeks."

The defendants contend that there is a vital variance

in the proposition submitted by the notices and as stated upon the ballot from the actual provisions of the contract itself; that the notices and ballot directly state that the United States shall deliver storage water to supplement the district's natural flow of water from the Frenchman River; that the contract states that additional water may be supplied if available; that no mention is made of water originating and flowing in the Stinking Water Creek, which is under the district's original water rights and a part thereof; and that the matter as submitted by the notice and ballot states the sale to be for the consideration of $247,000, however article 10 of the contract adds the provision that any money expended to adequately acquire title to said property shall be deducted from the stated consideration.

The record discloses, from the testimony of Paul H. Berg, a civil engineer and project manager employed by the Bureau of Reclamation, in explanation for the reason for inserting the words "if available," that the amount of water cannot be guaranteed during the year when the total flow of the river is not sufficient to fulfill the contract, but the district would get all of the natural flow of water from the Frenchman River. It is obvious that if due to moisture conditions there is no water in storage, it is impossible to deliver to the district more than the natural flow of the river.

With reference to the complaint made by the defendants that no mention was made in the notices or ballot of the water originating and flowing in the Stinking Water Creek, which is under the district's original water rights, we believe there is no basis for this complaint, because the contract provides that the district shall have all of its natural flow water rights and, in addition, the two streams merge at a point above the point of diversion, so the Frenchman River carries its flow and that of the Stinking Water Creek after they merge and from that point the stream is known only as the Frenchman River.

With reference to the contention that the notice and ballot stated that the sale price of the irrigation works was for $247,000 but that article 10 of the contract provided that any money expended to adequately acquire title should be deducted from the consideration, the sale of the irrigation works is no different than any other sale. If the district does not have title to any of its system of works, the district must compensate the government for the amount expended to acquire title. This provision of the contract, as well as others, was fully explained to the electors. The record shows no complaint made with reference thereto.

From our research, recognizing the various types of notices that must be given relating to elections, the manner in which the same are given or should be given, and the sufficiency or insufficiency thereof, the statement in 18 Am. Jur., Elections, § 110, p. 248, is pertinent. It states: "The effect of an irregularity in the giving of the prescribed notice may depend upon, or be affected by, the character of the election. It is clear that since an entire failure to give the notice required by statute does not necessarily avoid a general election, an imperfect or defective notice which does not mislead electors so that they lose the right to exercise their franchise certainly will not do so. It is equally clear in the case of special elections wherein the necessity for notice is so much more urgent that the rule as to compliance with statutory requirements in the giving of notice should be much more strictly enforced. Considerable liberality is, however, allowed even in these elections and it is a rule of pronounced authority that the particular form and manner pointed out by a statute for giving notice is not essential, provided, however, there has been a substantial compliance with statutory provisions. Following this rule, it has been held that where the great body of electors has actual notice of the time and place of holding the election and of the questions submitted, the requirement as to notice is satisfied. Thus, the formali-

ties of giving notice, although prescribed by statute, are frequently considered directory merely in the absence of an express declaration that the election shall be void unless the formalities are observed. This liberal rule is based upon the theory that where the people have actually expressed themselves at the polls, the courts are strongly inclined to uphold, rather than to defeat, the popular will." See, also, 29 C. J. S., Elections, § 73, p. 97.

In Hemmi v. James, 164 Wash. 170, 2 P. 2d 750, the following was quoted with approval from State ex rel. Mullen v. Doherty, 16 Wash. 382, 47 P. 958, 58 Am. S. R. 39: "The rule established by an almost unbroken current of authority is that the particular form and manner pointed out by the statute for giving notice is not essential, and where the great body of the electors have actual notice of the time and place of holding the election, and of the questions submitted, this is sufficient. The vital and essential question in all cases is whether the want of the statutory notice has resulted in depriving sufficient of the electors of the opportunity to exercise their franchise to change the result of the election." Many cases are cited in Mullen v. Doherty, *supra*, to the same effect. See, also, Natural Products Co. v. DuPage County, 314 Ill. 74, 145 N. E. 298; England v. McCoy (Tex. Civ. App.), 269 S. W. 2d 813.

Section 46-194, R. R. S. 1943, makes no specific requirement as to the form of notice to be given to the electors with reference to an election to be held to approve or disapprove a contract such as in the instant case. As we view the record and the authorities heretofore cited relative to the notice given in the instant case, we conclude that there was substantial compliance with the statutory provisions requiring notice. There is no evidence that the electors were in any respect misled. We conclude that the defendants' assignment of error cannot be sustained.

Section 46-1,151, R. R. S. 1943, provides in part: "The

board of directors of any irrigation district heretofore or hereafter organized may, in its discretion, before or after the making of any contract with the United States * * * or the taking of any particular steps or action, commence a special proceeding in the district court of the state, in and by which the proceedings of such board and of such district leading up to or including the making of any such contract, and the validity of any of the terms thereof, * * * or the taking of any particular steps or action, shall be judicially examined, approved and confirmed, or disapproved and disaffirmed."

The Act of Congress of May 15, 1922, 43 U. S. C., § 511, p. 6320, grants authority to the Secretary of the Interior to enter into contracts with existing irrigation districts: "Provided, That no contract with an irrigation district under this section and sections 512 and 513 of this title shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid."

Section 46-126, R. R. S. 1943, provides in part: "The board (board of directors of an irrigation district) may enter into any obligation or contract with the United States for the construction, operation, and maintenance of the necessary works for the delivery and distribution of water therefrom under the provisions of the Federal Reclamation Act, and all acts amendatory thereof or supplementary thereto, and the rules and regulations established thereunder; or the board may contract with the United States for a water supply under any Act of Congress providing for or permitting such contract, * * *."

Section 46-1.143, R. R. S. 1943, provides in part: "The board of directors of any irrigation district organized under the laws of this state may enter into contracts for a supply of water for the irrigation of lands within such

irrigation district with * * * the United States of America. The source of supply of such water may be either within or without the boundaries of the State of Nebraska, and the water supply may be either the entire supply of water for such district or to supplement an appropriation already made by such district."

Section 46-273, R. S. Supp., 1955, provides in part: "When the officers of the United States Bureau of Reclamation shall determine that any water so developed or stored is in excess of the needs of the project as then completed or is flood or unused water, the United States may contract to furnish such developed, stored, flood, or unused water, under the terms and conditions imposed by Act of Congress and the rules and regulations of the United States, to any person who may have theretofore been granted a permit to appropriate a portion of the normal flow of any stream, if the water so appropriated, shall during such portion of the year, be found insufficient for the needs of the land to which it is appurtenant. The United States and every person, entering into a contract as herein provided, shall have the right to conduct such water into and along any of the natural streams of the state, but not so as to raise the waters thereof above the ordinary high water mark, and may take out the same again at any point desired, without regard to the prior rights of others to water from the same stream; but due allowance shall be made for losses in transit, the amount of such allowance to be determined by the Department of Roads and Irrigation."

The foregoing statutory provisions disclose that a special proceeding may be had in the district court with reference to the confirmation of a contract between an irrigation district and the United States. In addition, the above sections of the statute disclose that the board of directors of an irrigation district may enter into a contract with the United States for the construction, operation, and maintenance of the necessary works for the delivery and distribution of waters therefrom and for

a supply of water to supplement an appropriation already made by said district under the provisions of the federal Reclamation Act and the statutes of Nebraska.

The purpose of the contract in the instant case is to provide the district with a supplemental supply of water from storage works and to have water available in larger quantities for use during the growing season so the landowners may irrigate more often than they do at the present time.

In the case of Livanis v. Northport Irrigation Dist., 121 Neb. 777, 238 N. W. 757, this court said: "However, the contract must be construed with reference to the federal and state statutes, which are as much a part thereof as though incorporated into the body of it. The powers, duties and liabilities of the district and the United States are only such as each is authorized by statute to assume. The federal statute applicable to this case is 43 U. S. C. A., secs. 523, 524. These statutes authorize the secretary of the interior to dispose of surplus water impounded for the purpose of irrigating public lands to, among others, irrigation districts. * * * Does this create a new type of irrigation district? Possibly not, considered as a corporate entity. But it does enable the district to contract for delivery at the land for water, without liablity for negligence in the construction, operation and maintenance of the ditches of another, who is a common carrier so far as the owners of land in the district are concerned. * * * The statutes of the state may not create a new type of district, but they do place upon districts a different function and duty, and they do specificially authorize such a contract as the one in question."

This court has held that an irrigation district may enter into a contract with the United States for a water supply as provided in sections 46-1,147 to 46-1,150, R. R. S. 1943, and have an adjudication by a special proceeding in rem for the approval and confirmation of the organization of the district and the proceedings of the board of directors thereof leading up to and including

the making of a contract. See Frenchman-Cambridge Irrigation Dist. v. Ferguson, 154 Neb. 20, 46 N. W. 2d 692.

In the case of Frenchman-Cambridge Irrigation Dist. v. Ferguson, *supra*, it is said: "It will be observed that the very provisions of the statute itself gave the district court jurisdiction, power, and authority to decide the issues presented in such a proceeding, which the district by its own petition identically prayed that it should do. Only recently this court recited the legal history, attested the constitutionality of similar confirmatory proceedings, and called attention to the fact that they were special proceedings in rem, wherein, upon proper legal notice, jurisdiction was given the district court to render a valid judgment upon the issues appropriately involved in the particular case presented. Nebraska Mid-State Reclamation District v. Hall County, 152 Neb. 410, 41 N. W. 2d 397."

The above language indicates that the court, in the construction of a contract, has power to declare an objectionable article thereof to be invalid. See, Middle Rio Grande Water Users Assn. v. Middle Rio Grande Conservancy Dist., 57 N. M. 287, 258 P. 2d 391; Owl Creek Irrigation Dist. v. Bryson, 71 Wyo. 30, 253 P. 2d 867.

We make this observation at this point for the reason that the defendants, in their cross-appeal, attack certain articles of the contract.

The plaintiff assigns as error the following: (1) The trial court erred in determining that the Frenchman Valley Irrigation District has a vested right in all the natural flow of the Frenchman River and Stinking Water Creek; (2) the trial court erred in finding that the right to the floodwater and unused water in the reservoir of the United States at Enders, Nebraska, which is stored when not needed for irrigation, is vested in the landowners in the Frenchman Valley Irrigation District by virtue of a prior appropriation by said irrigation district; (3) the trial court erred in finding that the use of the

storage water cannot be limited by contract between the United States and the irrigation district to 160 irrigable acres; (4) the trial court erred in finding that the provisions of the contract for the sale of land owned by an individual in excess of 160 acres as a condition precedent to the right to receive storage water for more than 160 acres are in violation of the due process of law provisions of the federal and state Constitutions and are inapplicable, unenforceable, and void; and (5) the trial court erred in overruling the plaintiff's motion for a new trial, or in the alternative to vacate and set aside that part of the decree in which articles 16, 17, and 18 of the contract between the United States and the Frenchman Valley Irrigation District were held to be invalid, and to approve said articles and the contract in its entirety.

While the answer of the defendants indicates that the landowners in the district are the owners of the appropriative water rights which run to each and every acre of the district by virtue of the water right granted to the district and that the landowners of the district have a vested right in all of the flow of the Frenchman River and Stinking Water Creek, the defendants' brief indicates that they do not contend that the district owns all of the water of the Frenchman River and Stinking Water Creek, but do contend that the district and the landowners in it possess the sole right to the use of the natural flow of such streams to the extent required for irrigation purposes.

We believe the law is well settled in this state that the appropriator of the waters of a stream acquires a right to the use of such water for beneficial purposes in the growing of crops and within the limits of the capacity of the diversion works, and all waters not so needed or used are subject to subsequent appropriations for similar purposes. The appropriator of water of a stream does not acquire ownership of such water. A clear indication of the right of landowners to use water for irrigation purposes is exemplified by the following cases.

In Enterprise Irrigation Dist. v. Willis, 135 Neb. 827, 284 N. W. 326, the court recognized the principle of the beneficial use of water in the following language which would be applicable to the district in the instant case under its appropriative rights: "It is a principle of the common law that one may not divert more water, even under a valid appropriation, than he can put to a beneficial use. While many elements must be considered in determining whether water has been put to beneficial use, one is that it shall not exceed the least amount of water that experience indicates is necessary in the exercise of good husbandry for the production of crops. The extent to which landowners need and are entitled to have the benefit of irrigation water under a vested appropriation ordinarily depends upon aridity, rainfall, location, soil porosity, adaptability to particular forms of production and the use to which the irrigable lands are put. In other words, the duty of water may be defined as such a quantity of water necessary, when economically conducted and applied to the land without unnecessary loss, as will result in the successful growing of crops. 2 Kinney, Irrigation and Water Rights (2d ed.) secs. 902 and 903."

In Crawford Co. v. Hathaway, 67 Neb. 325, 93 N. W. 781, 108 Am. S. R. 647, 60 L. R. A. 889, the court recognized that a riparian owner's property right in water is usufructuary only. It was held: "The riparian owner acquires title to his usufructuary interest in the water when he secures the land to which it is an incident, and the appropriator acquires title by appropriation and the application of the water to some beneficial use; * * *." The court said: "In the light of the provisions of the act of congress as construed by the supreme court of the United States, the different acts of the legislature of this state relating to the appropriation of the waters flowing in the streams thereof, and taking notice of those historical facts connected with the development of which we have made mention, the conclusion appears to us irresist-

ible that every appropriator of water who has applied it to the beneficial uses contemplated by these several acts has acquired a vested interest therein, which gives him a superior title to the use of the water over the riparian proprietor whose right has been acquired subsequent thereto, or who has lost his right, once acquired by either grant or prescription. Assuming, then, as we think should be done, that the right of acquiring an interest in the use of water by appropriation when applied to the beneficial purposes of agriculture has existed in this state since its early settlement in those portions where irrigation is found to be necessary, * * *."

Section 46-233, R. S. Supp., 1955, provides in part: "(1) The United States of America and every person hereafter intending to appropriate any of the public waters of the State of Nebraska shall before (a) commencing the construction, enlargement, or extension of any works for such purpose, (b) performing any work in connection with the same, or (c) taking any water from any constructed works, make an application to the Department of Roads and Irrigation for a permit to make such appropriation."

Under Title 43, U. S. C., § 371, p. 6290, et seq., the Secretary of the Interior is authorized and directed to locate and construct irrigation works for the appropriation, development, and storage of flood and unused waters for irrigation. The federal government, under the laws of the State of Nebraska, has a right to appropriate flood and unused waters in connection with any irrigation project constructed by the United States, as indicated in section 46-233, R. S. Supp., 1955, and also as provided for in section 46-273, R. S. Supp., 1955, on the appropriation of said waters, in part, as follows: "The United States of America is hereby authorized, in conformity to the laws of the State of Nebraska, to appropriate, develop, and store any unappropriated flood or unused waters, in connection with any project constructed by the United States pursuant to the provisions

of an Act of Congress approved June 17, 1902, being an act providing for the reclamation of arid lands (32 Stat. L. 388), and all acts amendatory thereof and supplemental thereto."

Pursuant to the above sections of the statutes, the Secretary of the Interior of the United States filed an application with the Department of Roads and Irrigation of this state to store water in Enders Reservoir for the purpose of flood control and irrigation by the construction of a dam in the Frenchman River. The Department of Roads and Irrigation of this state approved the application and a permit was granted for such purpose, subject to the rights of prior appropriators.

In the case of United States v. Tilley, 124 F. 2d 850, in discussing the above provisions of the Nebraska statutes, the court said: "This language certainly evidences no intention to restrict in any respect the scope of the rights that might be acquired by the United States under a general appropriation, but rather, in a hospitable spirit, to give the fullest recognition to such rights and to their free use in the development and accomplishment of the purpose of the reclamation project."

The trial court invalidated the right of the United States to appropriate and store water in Enders Reservoir and to dispose of it as state and federal laws require. The landowners in the district do not have a vested right in the flood and unused waters. The trial court erred in so holding.

The defendants contend that articles 16, 17, and 18 of the contract here involved violate the due process clause of the state and federal Constitutions. The above articles were inserted in the contract pursuant to the requirements contained in section 46 of the act of May 25, 1926, 43 U. S. C., § 423e, p. 6302.

Article 16 provides: "a. As used herein, the term 'excess land' means that part of the irrigable lands within the District in excess of 160 acres held in the beneficial ownership of any single person; or in excess of 320 acres

held in the beneficial ownership of husband or wife as joint tenants or as tenants in common. The term 'large landowner' means an owner of excess lands, and the term 'nonexcess land' means all irrigable land under the project which is not excess land as defined herein.

"b.   Each large landowner as a condition precedent to the right to receive water for any of his excess lands shall:   (1) Before the initial delivery date or before the expiration of six months from the announcement thereof, whichever occurs first, execute a valid recordable contract in form satisfactory to the Secretary, agreeing to the provisions herein contained and agreeing to dispose of his excess lands in accordance therewith to persons who can take title thereto as nonexcess land as herein provided and at a price not to exceed the approved appraised value of such excess land, and within a period of ten years after the date of the execution of said recordable contract, and agreeing further that if said land is not so disposed of within said period of ten years, the Secretary shall have the power to dispose of said land subject to the same conditions on behalf of such large landowner subject to conditions all as herein provided; and the District agrees that it will refuse to deliver water to any large landowner other than for his nonexcess lands until such owner meets the conditions precedent herein stated."

Subparagraph (2) thereunder makes reference to notice, which we deem unnecessary to set out.

Article 17 relates to the valuation and sale of lands, the appointment of appraisers, and other matters relating to the subject of the sale of excess lands.

Article 18 relates to existing water rights.  Paragraph "a" thereunder provides:  "Water diverted to the District pursuant to this contract to which the District has existing rights as water of natural flow at the time of diversion is herein termed 'natural flow water.'  All other water diverted and furnished to the District pursuant to this contract is herein termed 'project water.'  The

natural flow water and the project water must of necessity be transported through the same project facilities to reach District lands. Notwithstanding such mingling of water, the provisions of Articles 16 and 17 shall be applicable to the quantity of water representing project water and shall not affect the quantity of water representing natural flow water."

Paragraph "b" provides: "The District will provide and maintain separate outlets from its distribution system for nonexcess and excess lands, as defined in Article 16 not covered by recordable contract. The District will install, operate, and maintain water measuring equipment at delivery points to excess lands not covered by recordable contract. Measuring devices installed and maintained by the United States in works constructed by the United States will be used to measure both the District's natural flow water and project water delivered to the District pursuant to this contract."

The controlling language on this phase of the contract is the portion of 43 U. S. C., § 423e, p. 6302, which authorizes the United States to enter into contracts in a form to be approved by the Secretary of the Interior with an irrigation district organized under state law for the construction of irrigation works, and providing for payment of the cost thereof by the district in not more than 40 years. Apparently desirous of taking advantage of this legislation, the state enacted sections 46-126 and 46-1,143, R. R. S. 1943, heretofore set out.

The part of section 423e, 43 U. S. C., above mentioned, dealing with excess land, or 160-acre limitation, reads as follows: "Prior to or in connection with the settlement and development of each of these projects, the Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authorities of the State or States wherein said projects or divisions are located whereby such State or States shall cooperate with the United States in promoting the settlement of the projects or divisions after completion and in the securing

and selecting of settlers. Such contract or contracts with irrigation districts hereinbefore referred to shall further provide that all irrigable land held in private ownership by any one owner in excess of one hundred and sixty irrigable acres shall be appraised in a manner to be prescribed by the Secretary of the Interior and the sale prices thereof fixed by the Secretary on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works; and that no such excess lands so held shall receive water from any project or division if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands under terms and conditions satisfactory to the Secretary of the Interior and at prices not to exceed those fixed by the Secretary of the Interior;
* * * ."

It was the excess-acres provision that the trial court refused to approve on the ground that the landowners in the district had a vested right in the water appropriated by the government and that such provisions constituted a taking of property without due process of law. As noted by a reading of article 18, the excess-lands provisions of the contract under articles 16 and 17 of the contract are made applicable only to the project water and not to the natural flow water as it is defined in the contract. Referring to article 18a, it is specifically provided that the excess-acres provision shall not affect the quantity of water representing natural flow water. The position of the defendants is that they have a vested right to all of the water from the Frenchman River and Stinking Water Creek by virtue of water right granted to the irrigation district.

There is nothing in the Reclamation Act which compels an individual who owns more than 160 acres of land to sell any of his land as a condition to receiving water sufficient for 160 acres. He may retain all of his land, receiving federal project water for the first 160 acres, and irrigate the remainder of his land under his natural flow

water rights. It is only where he elects to request delivery of project water for the portion of his land in excess of 160 acres that he may be compelled to dispose of the excess land within a period of time fixed by the Secretary of the Interior.

The 160-acre limitation provisions of the reclamation laws have been specifically considered in several cases, and have been a controversial issue in the courts of this country over a considerable period of time. It would unnecessarily lengthen this opinion to analyze all of the cases relating to this subject. However, we deem it necessary to set out at some length a few of such cases to disclose what the majority of the courts of this country hold with reference to this part of such a contract.

In Nampa & Meridian Irrigation Dist. v. Petrie, 28 Idaho 227, 153 P. 425, the irrigation district filed a petition for the examination, approval, and confirmation of a contract between the district and the United States under which the district was to be supplied with supplemental water through the works to be constructed by the United States. The contract was written under the provisions of the Warren Act which provided that water should not be delivered to any one landowner in excess of an amount sufficient to irrigate 160 acres. The defendant, who was the owner of land in excess of 160 acres, objected to the contract and the provision thereof relating to excess acres. The court, in discussing this limitation, pointed out that the restriction related to the use of water, and in sustaining the contract said: "It will, therefore, be observed that the act of Congress of February 21, 1911, known as the Warren Act, and the subsequent act of Congress passed August 13, 1914, known as the Reclamation Extension Act, make no provision for residence upon the lands to be irrigated from the waters of a government project. The acts of June 17, 1902, and of February 21, 1911, both provide, however, that water shall not be furnished from any such

reservoir or delivered through any such canal or ditch to any one land owner in excess of an amount sufficient to irrigate 160 acres. Consequently, any owner of land within a government project or an irrigation district cannot secure the use of water from a government project in excess of an amount sufficient to irrigate 160 acres, whether he owns more than that amount of acreage in such district or not.

"The regulations of the Secretary of the Interior, heretofore referred to, contain the following provision: 'Holders of more than 160 acres of irrigable land within a reclamation project must sell or dispose of all in excess of that area before they can receive water.' * * *

"This provision of the contract is strenuously protested against by appellants for the reason, as they contend, that a land owner within the district who owns land in excess of 160 acres would be forced to dispose of all the lands he possesses in excess of 160 acres, or suffer the consequences of being taxed for all his lands, yet be denied water for the same in excess of 160 acres. The restriction under the above regulation is to the use of water. The land owner who has land in excess of 160 acres may permit the whole thereof to be assessed with a government water right rather than insist that only 160 acres be so assessed, as, although he might be able to secure only enough water to irrigate 160 acres for his own use, the balance of his land would be provided with a permanent water right which he might dispose of within a reasonable time; or, upon the apportionment of benefits, it may be determined that none of his land would be liable to assessment of benefits for a water right, or that no greater portion of his land than 160 acres would be susceptible of irrigation and to the assessment of benefits.

"There can be no doubt that Congress has the power to restrict the right to the use of water furnished from government projects to 160 acres standing in the name of an individual, * * *." The contract with the

160-acre limitation was approved. The court held: "Congress has the undoubted power to restrict the right to the use of water furnished from government projects to 160 acres standing in the name of any one land owner. Having the power to dispose of the right to the use of water made available by the completion of a reclamation project, Congress is in a position to fix the terms and conditions of the use and to authorize the Secretary of the Interior to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying its legislation into full force and effect. * * *" See, also, In re Goshen Irrigation Dist., 42 Wyo. 229, 293 P. 373; Klamath County v. Colonial Realty Co., 139 Or. 311, 7 P. 2d 976; Saylor v. Gray, 41 Ariz. 558, 20 P. 2d 441.

One of the more recent cases is Middle Rio Grande Water Users Assn. v. Middle Rio Grande Conservancy Dist., 57 N. M. 287, 258 P. 2d 391, decided in 1953. This case upheld the validity of the 160-acre limitation of the federal Reclamation Act. This was an action to determine the validity of the contract between the United States and the district. The contract involved the delivery of water under vested rights as well as supplemental water provided through the construction of the project works which had previously been constructed, and under the contract they were being reconstructed and rehabilitated. Section 32 of the contract provided: "The irrigation water supply furnished through the project works constructed or rehabilitated in pursuance of this contract shall be delivered in accord with the excess land provisions of the Federal Reclamation laws and regulations of the Secretary promulgated thereunder; Provided, that nothing in such regulations shall interfere with any vested water right as provided in Section 8 of the Reclamation Act of June 17, 1902, * * *."

The Justice who wrote the opinion on the validity of the contract apparently was under the impression that

the 160-acre limitation applied to vested water rights, and said: "The attempt to limit the delivery of water to those having vested rights to more than sufficient to irrigate 160 acres is, in my opinion, clearly unconstitutional, although I freely admit the right of the United States to limit the use of new or additionally developed water to 160 acres. As the majority hold otherwise, my views on this point become my dissent on this point."

The Chief Justice concurred in the opinion on the validity of the contract, except that part with reference to invalidity of the 160-acre limitation, to which he dissented, and was joined by other members of the court in the dissent. This resulted in sustaining the excess-acre limitation as contained in the contract. The Chief Justice on this phase of the contract said: "The opinion proposed by Mr. Justice McGhee for disposition of this appeal meets with my approval in the main, indeed, in all respects except as disagreement with it shall be pointed out in what is said hereinafter.

"The first question resolved by him which brings about conflict in our views is the excess-land provision, sometimes called the 160-acre limitation. His discussion of it is initiated by quoting 1941 Comp., Sec. 77-3112, declaring the limitation to be in accord with the declared public policy of this state, followed by quoting Article 32 of the contract providing * * * (which we have heretofore set out) and closing with the proviso: '* * * Provided, that nothing in such regulations shall interfere with any vested water right as provided in Section 8 of the Reclamation Act of June 17, 1902 (32 Stat. 388), and in Section 203 Title II, Flood Control Act of June 30, 1948 (62 Stat. 1171).'

"Now just what is the excess-land proviso, or 160-acre limitation, to be found in the contract over which division in the court has developed as disclosed by a statement of the views of Mr. Justice McGhee on the subject in the opinion prepared by him? The controlling language on this phase of the contract is a por-

tion of the Federal Reclamation law to be found in U. S. C. A., Title 43, as section 423e; authorizing the United States to enter into contracts in a form to be approved by the Secretary of the Interior with an irrigation district or districts organized under state law for the construction or rehabilitation of irrigation works; and providing for payment of the cost thereof by the districts during the time they are in control of the United States, in not more than forty years. It was to enable irrigation and conservancy districts in our state to take advantage of the spirit of cooperation reflected by legislation such as this enacted by the Congress that caused the New Mexico legislature to enact L. 1939, c. 148, pursuant to which the contract before us was executed. * * * (The portion of the section dealing with the excess lands, or 160-acre limitation we have previously quoted in the opinion and will not repeat here in connection with the cited opinion.)

"We should not, without a thorough understanding of just what the excess-acreage limitation does, strike it down as overriding constitutional barriers sought to be raised against it. It is not a confiscation of the water user's land. Even though he refuses to comply with the conditions imposed by the limitation, he is not denied water for the 160 acres within the limitation. The excess acreage limitation does not require that he sell excess land on the penalty of a denial of further government service. It merely limits him to 160 acres' irrigation of land held in beneficial ownership, or 320 acres held by husband and wife in beneficial ownership as joint or community property. Water from unavoidable seepage or percolation is not forbidden 'furnishing' of water under the contract. The owner has 10 years within which to make any sale of excess land at its fair bona fide value at date of appraisal in a manner prescribed by Secretary of Interior. The land will carry its fair market value as irrigated and as enhanced by any existing construction but must exclude any

increment of value arising from the construction of the project about to be undertaken."

The Chief Justice quotes the following from 38 Cal. Law. Rev. 603 (1950): " 'The acreage limitation provisions of the federal reclamation laws, are not new. The first such provision of general application appeared in Section 5 of the original Reclamation Act of 1902. The most recent enactment of general application is Section 46 of the Omnibus Adjustment Act of May 25, 1926. This particular federal statute is the one applicable to the Central Valley Project, and the inclusion of its requirements in water service and repayment contracts with irrigation districts in the Central Valley therefore is a mandate by the Congress, and not open to a bargaining process during contract negotiations.' "

The Chief Justice further said: "It is interesting to note that although the excess acreage limitation, in one form or another, has been a part of the Federal Reclamation law for more than 50 years, not a single case in an appellate court can be cited holding it invalid, or subject to constitutional barriers invoked against it. It has been involved to a greater or less extent in certain decisions of several western states and in one federal case coming to our attention. See Nampa & Meridian Irr. Dist. v. Petrie, 28 Idaho 227, 153 P. 425; Saylor v. Gray, 41 Ariz. 558, 20 P. 2d 441, 444; Klamath County v. Colonial Realty Co., 139 Or. 311, 7 P. 2d 976; In re Goshen Irr. Dist., 42 Wyo. 229, 293 P. 373; Shoshone Irr. Dist. v. Lincoln Land Co., D. C., 51 F. 2d 128."

On June 23, 1958, the Supreme Court of the United States released its opinion in the following four cases: The Ivanhoe Irrigation District and the State of California, Appellants, v. Courtney McCracken, et al.; The Madera Irrigation District and the State of California, Appellants, v. Carl F. Steiner, et al.; The Madera Irrigation District, Appellant, v. Phillip and Jane E. Albonico; The Santa Barbara County Water Agency, Appellant, v. Maurice A. Balaam, et al., 356 U. S. —,

78 S. Ct. 1174, 2 L. Ed. 2d —. The background and history of these four cases is deemed unnecessary to relate. Specifically involved in the cases were two statutory enactments. The one of primary interest here is section 5 of the Reclamation Act of 1902, 32 Stat. L. 389, 43 U. S. C., § 431, p. 6304, substantially reenacted in section 46 of the Omnibus Adjustment Act of 1926, 44 Stat. 649, as amended, 70 Stat. L. 524, 43 U. S. C., § 423e, previously referred to in this opinion.

Also involved is section 8, 32 Stat. L. 390, 43 U. S. C., §§ 372, 383, pp. 6290, 6293. This section provided in substance that nothing in the act should be construed as affecting or intending to affect or to in any way interfere with the laws of the state relating to the control, appropriation, use, or distribution of water used in irrigation, or in any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of the act should proceed in conformity with such laws, and nothing therein should in any way affect any right of any state or of the federal government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof; provided, that the right to the use of water acquired under the provisions of the act should be appurtenant to the land irrigated, and beneficial use should be the basis, the measure, and the limit of the right.

The trial court in the Santa Barbara County confirmation case, contrary to the action in the other cases, upheld the contract and granted confirmation. The other cases, relating to the excess-land provision, declared the same invalid and unenforceable, and as conflicting with both the state law and the Reclamation Act. In other words, the court found the application of the excess-land provision to be unconstitutional.

In its opinion, the Supreme Court of the United States said: "From the beginnings of the federal reclamation program in 1902, the policy as declared by the Congress has been one requiring that the benefits there-

from be made available to the largest number of people, consistent, of course, with the public good. This policy has been accomplished by limiting the quantity of land in a single ownership to which project water might be supplied. It has been applied to public land opened up for entry under the reclamation law as well as privately owned lands, which might receive project water. See Taylor, The Excess Land Law: Execution of a Public Policy, 64 Yale L. J. 477."

The court further said: "Appellees urge, however, that the federal statutes requiring insertion of these provisions in the contracts are unconstitutional as a denial of due process and equal protection of the law under the Fifth and Fourteenth Amendments. They assert that the excess acreage provisions amount to a taking of vested property rights both in land and irrigation district water, and discriminate between the nonexcess and the excess landowner. We cannot agree. * * * In any event, the provisions under attack are entirely reasonable and do not deprive appellees of any rights to property or water. It is beyond dispute that excess land will be benefitted by delivery of water to neighboring and nearby nonexcess land. This fact was recognized by the California Supreme Court in the Santa Barbara case. 47 Cal. 2d 699, 712, 306 P. 2d 875, 883. * * * We deem it unnecessary to discuss other claims in this area, but repeat in connection therewith that if the United States takes any compensable water or property right the courts are open for redress.

"As to the claim of discrimination in the 160-acre limitation, we believe that it overlooks the purpose for which the project was designed. The project was designed to benefit people, not land. It is a reasonable classification to limit the amount of project water available to each individual in order that benefits may be distributed in accordance with the greatest good to the greatest number of individuals. The limitation insures that this enormous expenditure will not go in dispro-

portionate share to a few individuals with large land holdings. Moreover, it prevents the use of the federal reclamation service for speculative purposes. In short, the excess acreage provision acts as a ceiling, imposed equally upon all participants, on the federal subsidy that is being bestowed."

The court held the excess-land provision of the contract to be constitutional in all respects and reversed the California Supreme Court in the cases holding to the contrary.

As we view it, under the terms of the contract the natural flow water rights of the landowners are in no manner impaired, and under the reasoning of the foregoing-cited authorities the excess-acres provisions of the contract are valid. We hold that the trial court erred in not holding the same to be valid, and conclude that this portion of the contract should have been approved.

The defendants, in their cross-appeal, attack certain paragraphs of the contract as infringing upon and impairing the vested rights of the landowners of the irrigation district to the natural flow of the water in the Frenchman River. We deem it unnecessary, in the light of what we have heretofore said, to take up and analyze the objections made by the defendants to the different paragraphs of the contract.

We note that the defendants, in their cross-appeal, quote from an exhibit the amount of water diverted in April and through October for the years 1945 through 1956, and state that 28,885 acre feet was the average natural flow of the Frenchman River to which the landowners are entitled by virtue of their vested rights in the appropriation of said water, that is, that the landowners of the district have the exclusive property right to the natural flow of the Frenchman River, and that the amount of the natural flow thereof may not be reduced without the consent of the respective landowners.

Reference is made to the testimony of Paul H. Berg, project manager of the Bureau of Reclamation, to the

effect that there was no way of determining the amount of water that was delivered to the lands within the district. He testified that he obtained the figures from the State Engineer from about 1919, and that 20,000 acre feet was the average of what was used for irrigation purposes by the landowners in the past. The 20,000 acre feet, as it appears in the contract, was determined on the basis of a study of the usage of water for irrigation purposes. The 28,885 acre feet the defendants quote as being the average natural flow is the water that passed through the headgate, and not what was used for irrigation purposes. The defendants do not say what amount of water was actually used for irrigation purposes. The repayment contract is based on the minimum of 20,000 acre feet. If the amount had been larger, the repayment contract would have increased accordingly. The formula for the repayment based on the amount of 20,000 acre feet appeared to be sufficient on the average for irrigation purposes in the district, and for that part of water above 20,000 acre feet, the contract provided payment at the rate of $1.50 per acre foot.

As we view the record, the 20,000 acre-feet limitation is for contract purposes, and more accurately discloses the amount of water used for irrigation purposes by the landowners of the district. The figure of 28,885 acre feet does not take into account the waste, evaporation, seepage, and water that is spilled into the river, and measurements are not made as to the amount of water each farmer receives. The district does not have a dam or any means by which the water is impounded so that it can be delivered as needed. The water is measured at the headgate only, and it is not known what amount of water is used or turned into the spillways.

The purpose of the Reclamation Act is to develop lands for irrgation, and to have water in storage allotted to the districts so it will be used for beneficial purposes. As stated in the contract, its fundamental purpose is to

enlarge, rehabilitate, and modernize the district's irrigation system which is in a bad state of repair, and the canal is not large enough to convey the water appropriated. In addition, the purpose of the contract is to provide the district with a supplemental water supply.

Some reference is made to another irrigation district which would use part of the facilities of the district here involved. Such irrigation district is involved here only to the extent that it might participate in the joint use of the main canal, in other words, the main canal would service the two districts, and this only as a means of economy and would in no manner constitute an infringement upon the vested water rights of the landowners in the Frenchman Valley Irrigation District to the natural flow of the water in the Frenchman River.

The contract specifically recognizes the natural flow rights of the district and in no manner attempts to, nor does it, limit or impair those rights. The contract clearly differentiates between the part of the district's annual supply that is delivered from the natural flow under the district's existing water rights, and that part delivered from storage. The contract specifically recognizes the natural flow rights as remaining in the landowners of the district. Reference is made to articles 9b, 10, 18a, 18b, and the preliminary statement in the contract so set forth.

The defendants' objections to the contract relate primarily to the proposition that the vested water rights of the district may be impaired. We believe a sufficient answer to this contention is that the property rights of the district are not impaired but fully recognized by the contract.

In the light of our conclusion as hereinbefore set out, we deem further discussion of the defendants' cross-appeal unnecessary.

For the reasons herein given, the judgment of the trial court is reversed with reference to the part thereof disapproving certain parts of the contract.

We reverse the judgment and remand the cause with directions to render judgment in favor of the plaintiff in accordance with this opinion, approving the contract in its entirety.

REVERSED AND REMANDED WITH DIRECTIONS.